STATE v. HAYWOOD LEMUEL TEMPLE.

(Filed 20 January, 1967.)

**1. Searches and Seizures § 1; Criminal Law § 79—**

Testimony on the *voir dire* that defendant stated he had nothing to hide and that the officer could search his automobile, *held* to support the court's finding that defendant consented to the search of his car, and motion to suppress the evidence disclosed by the search was properly overruled.

STATE *v.* TEMPLE.

**2. Criminal Law § 71—**     **Evidence held to support finding that incriminating statement was freely and voluntarily made.**

Testimony on the *voir dire* to the effect that defendant was advised that he was suspected of raping a named female child, that defendant did not have to make a statement, that any statement made by him could be used against him in court, that he could telephone a lawyer or anyone he wanted to, that defendant then denied being with prosecutrix on the day in question, but that some days later, after defendant had been again advised of his constitutional rights in the same manner, and was told that a witness had seen the girl with him in his car on the day in question, defendant stated that prosecutrix had insisted on getting into his car with him and had voluntarily submitted to his advances, *held* to support the court's finding that the second statement was freely and voluntarily made, without threats or promises, after defendant had been advised of his constitutional rights. *Miranda v. Arizona*, 384 U.S. 436, having been announced subsequent to the trial, has no application.

**3. Criminal Law § 53—**

A witness qualified as a medical expert may testify that the presence of acid phosphatase in a specified concentration in the vagina indicated the presence of male seminal fluid.

**4. Criminal Law § 162—**

In a prosecution for carnal knowledge of a female child under the age of twelve years, the admission of testimony of a medical expert that the female organ of prosecutrix was penetrated full depth by a man's male organ, even though such testimony is based in part on information not acquired by the witness's personal examination, can not be held for prejudicial error when there is an overwhelming mass of other competent testimony tending to show that the prosecutrix' female sexual organ was penetrated by the male sexual organ, penetration to any extent being sufficient to constitute the offense.

**5. Rape § 8—**

Consent of prosecutrix is no defense in a prosecution for carnal knowledge of a female child under the age of twelve years. G.S. 14-21.

**6. Rape § 11—**

The evidence in this prosecution of defendant for carnal knowledge of a female child under twelve years of age *is held* amply sufficient to overrule defendant's motions to nonsuit.

APPEAL by defendant from *Hall, J.,* Second Week February 1966 Regular Criminal Session of WAKE.

Criminal prosecution on an indictment charging defendant on 5 June 1965 with unlawfully, feloniously, and carnally knowing and abusing Libby Gray Beasley, a female child under the age of twelve years, to wit, of the age of ten years. G.S. 14-21.

Defendant, who is an indigent, was represented by his court-appointed counsel, R. L. McMillan, Jr. Plea: Not guilty. Verdict: "Guilty of rape with the recommendation of life imprisonment."

From a judgment of imprisonment for life, defendant appeals.

*Attorney General T. W. Bruton and Deputy Attorney General Harry W. McGalliard for the State.*

*Robert L. McMillan, Jr., for defendant appellant.*

PARKER, C.J.   The State's evidence shows these facts: On 5 June 1965 Ann Stanley Beasley and her daughter Libby Gray Beasley and her little son were living downstairs in a two-story apartment at 21 North Harrington Street in Raleigh. At the time Libby Gray Beasley was ten years old. She is mentally retarded, but is considered trainable and attended a special class at Fred Olds School. Defendant with his wife and three children lived in the upstairs apartment.

About 4:30 p.m. on that same day Libby's mother had her to go to the bathroom and wash her face. At that time Libby was wearing a white blouse and a shift and had on shoes, socks, pants, and a slip. About 5 p.m. on this same day defendant and Libby Gray Beasley were seen by Mrs. Martha Raper, who operates a store at 201 North Harrington Street in Raleigh, sitting in defendant's automobile about half way down the block on Jones Street.

After 5 p.m. of this same day Martha Raper told Libby's mother that she had seen Libby sitting in defendant's car. Libby's mother started looking for defendant, and could not find him or Libby. She was walking the floor crying. She saw defendant's car coming from down towards North Street. She hollered at him, but he did not stop. She did not see anyone in the car with him. After that she looked down the street, and saw Libby coming up to her home from towards North Street, the same way defendant's car had come. At this time Libby had her head hung down and her finger in her mouth. Her dress was bloody. There were smears on the front of her dress, and she had hand prints on her face and the side of her neck. She had some leaves in the back of her hair, mixed with dirt. Her mother took her in the bathroom, and examined her by pulling her dress up, and noticed that she did not have any pants on. She saw smears of blood on her legs and thighs and between her legs and all around her. There were smears of blood on her private parts, and she was very upset. Earlier that day when she had her to go to the bathroom to wash her face, she did not have any blood smears on her and she did not have any leaves in her hair or any hand prints on her neck and face. Earlier that day, about lunch time, she had noticed that Libby was wearing pants. Libby's mother testified: "On this date, I imagine that Libby Gray acted like a child between three to four years of age and she had not been able to tell me what happened." The State offered in evidence Libby's pants, blouse, shift, and slip.

Before Libby came home, her mother called the police. Sergeant

Stoudenmire was at her home when Libby came in, and afterwards Lieutenant Duke arrived. Both were police officers. Libby was carried to Rex Hospital. About 9:45 p.m. on 5 June 1965 Libby was examined in the emergency room of Rex Hospital by Dr. G. Howard Satterfield, a graduate of Duke University School of Medicine, Class of 1957, and licensed to practice medicine in North Carolina as a specialist in obstetrics and gynecology. The trial court found as a fact that Dr. Satterfield is an expert in the field of medicine, specializing in obstetrics and gynecology.

Dr. Satterfield made a general and a pelvic examination of Libby. His general examination revealed an area of "petechial hemorrhages" in the shape of a hand print on the left side of her cheek and in her ear. Such hemorrhages usually come from a blow of some type. His pelvic examination disclosed the following: On the right hand side of the lip beside the birth canal, there was a skinned place where the superficial skin had been knocked off, about an inch and a half in length and half an inch in width. She had tears through the entire length of the hymenal ring. These tears were relatively fresh, and there was no evidence of any healing and no scab formation over the soft tissues of the skin. Along the vaginal canal there were more of these tiny "petechial hemorrhages" throughout the vagina and up into the area of the mouth of the womb. He obtained from right back of the mouth of the womb material for a test to be run in the laboratory of Rex Hospital to determine whether a male organ had been in this area. He placed this material obtained from Libby into a tube and put it into a box which he locked, and he then placed the box in the refrigerator in the laboratory of Rex Hospital and left it there for Dr. Arthur Davis, who had the only other key to it, to examine the next day.

Dr. Arthur Davis is a medical doctor licensed to practice in the State of North Carolina since 1962. Since 1962 he has been associate pathologist at Rex Hospital. After he had testified further in respect to his professional qualifications, the court found that he was an expert in medicine, specializing in pathology. On the morning of 6 June 1965 he received the locked box left for him by Dr. Satterfield, which he opened with a key and removed the test tube. The test tube contained a cotton swab which he gave to Mrs. Jackson to perform a chemical test. The test that she was to perform was an acid phosphatase test, and the matter was taken from a test tube labeled "Libby Gray Beasley."

Mrs. Jacquelyn Moore Jackson is a medical technologist at Rex Hospital, and for eight years has been a clinical chemist. She was certified as a medical technologist in 1949 and supervises the chemistry department at Rex Hospital. On 6 June 1965 she received the

test tube from Dr. Davis with the name "Libby Gray Beasley" thereon. In the test tube there was a swab with a cotton tip which she subjected to an acid phosphatase test and found 6.8 Bodansky units of acid phosphatase. She reported the result of this test to Dr. Davis.

Dr. Davis was recalled by the State and asked this question: "Do you have an opinion satisfactory to yourself as to the probable or likely source of acid phosphatase in the concentration of 6.8 Bodansky units in the area of the mouth of the womb of a female?" The defendant objected to the question, which the court overruled, and the defendant excepted and assigned this as error. He answered: "The presence of acid phosphatase in the concentration of 6.8 Bodansky units found in the vagina indicates the presence of male seminal fluid."

Dr. Satterfield testified he had a report from the laboratory indicating the amount or level of phosphatase concentration from the material that he obtained from Libby Gray Beasley. He was asked this question: "Dr. Satterfield, from your total examination and the information you have, do you have an opinion satisfactory to yourself as to whether or not the female organ of Libby Gray Beasley had been penetrated?" The defendant's objection to the question was overruled, and he excepted and assigned this as error. The doctor replied: "Yes, I do have an opinion and I feel that it was penetrated, yes." He was then asked this question: "Do you have an opinion satisfactory to yourself as to what the female organ of Libby Gray Beasley was penetrated by?" The defendant's objection to the question was overruled, and he excepted and assigned this as error. The doctor answered: "Yes, in my opinion from the findings, the laboratory findings, the female organs of Libby Gray Beasley were penetrated by the male penis." He was then asked: "Do you have an opinion satisfactory to yourself as to how much penetration, that is, in inches, of the female organs of Libby Gray Beasley there was?" He replied in substance: Full depth by a foreign object, being a male organ. Defendant's motion to strike the answer was overruled and he excepted and assigned this as error. Then he was asked this question by the State: "From your findings do you have an opinion satisfactory to yourself as to whether or not the female organs of Libby Gray Beasley had previously been penetrated in this fashion by a foreign object?" There was no objection to the question, and his answer was as follows: "I would say that they had not prior to the time in question. In other words, the tears of the hymenal ring or maidenhead had been placed back in position and put back so that they were not tears any longer, then the size of the opening of

the hymenal ring would have been approximately a centimeter in diameter."

About 6:30 p.m. on 5 June 1965 detective sergeant Stoudenmire talked to Libby and her mother at their home. He testified in substance: Libby was dressed in a "shift dress" and a blouse, and on this "shift dress" there were streaks of blood on the front and back, and in her hair there were dirt, grime, and "specs" of leaves. She was in a very upset condition. About 8 p.m. the same night Stoudenmire in company with two officers saw defendant asleep at David White's home at Route 2, Poole Road. Defendant was wearing a blue shirt and blue pants, and there were blood stains on his shirt-tail and on the right side of the fly of his pants. Stoudenmire took defendant's shirt and pants, and turned them over to Glenn Glesne of the State Bureau of Investigation. He asked defendant if he could search his automobile. At this point defendant's counsel moved to suppress any and all evidence obtained by Stoudenmire in any conversation with defendant on the ground that any statement by defendant was involuntary, and requested permission to interrogate Stoudenmire as to the circumstances attending any statements made by defendant. The judge directed the jury to go to their room, and stated to defendant's counsel he could proceed and also offer any evidence he desired to offer.

In the absence of the jury from the courtroom, Stoudenmire, in answer to questions asked him by the solicitor and defendant's counsel, testified in substance: He told defendant he was a suspect in a rape case and he wanted to talk to him in Raleigh. Defendant agreed to go. He asked defendant if he could search his automobile in the back yard; he was looking for a girl's panties. Defendant replied that he had nothing to hide and he could search his automobile. He found a pair of girl's panties in the back of defendant's car on the floor.

He took defendant to the detective bureau and talked to him. He told defendant again he was a suspect in a rape case, and the girl's name was Libby Beasley; that defendant did not have to make any statement to him, and if he (defendant) made any statement it could be used for or against him in court. He asked defendant if he wanted to make any telephone calls. He could call anybody he wanted to, and he could call a lawyer. Defendant denied being with Libby the day of 5 June 1965.

About 1:30 p.m. on 8 June 1965 Stoudenmire went to the county jail, brought defendant to the detective bureau, and talked with him again. He again advised defendant of his constitutional rights as he had previously done. When he told him he had a right to call a

lawyer, defendant stopped him, and told him a lawyer had been to see him at the county jail and had advised him not to make any statement whatever. He told defendant: "You told me Saturday night that the girl was not in your car and I have learned of a witness that saw you with this girl and the girl was in your car." Then the record shows the following: "At this point he stopped me again, said he wanted to set this thing straight, stated that he did not exactly tell me that the girl was not in his car, he said that what he did tell me, that he did not force this girl to get into his car, he stated that he thought it was about 3:30 p.m. on the 5th that he talked to this girl on the corner of Harrington and Jones and that she insisted on going with him, got into his automobile and he told her to get out, said she would not get out, said he started to ride and the girl took off her panties in the automobile. He told her to put them back on and he said that she would not and he said that he continued to ride, rode out Rhamkatte Road to a point out there on the Rhamkatte Road. I asked him was it Yates Pond, said he thought it was; said the girl got out of the car and pulled her dress up over her head. He said he got out of the car and he took and put his finger into the girl's vagina; he then stated that the girl laid down and wilfully submitted to him, said he attempted to get his penis into her vagina but could not get it in good and that he ceased. He said he then brought the girl back to town and let her out on North Harrington Street in front of a tire place which is Allen's Tire Company located at the corner of North and Harrington Streets; stated he then went into the place on Poole Road where we found him." He used no force, he did not threaten defendant, and he made no promise to defendant to induce him to make a statement.

On cross-examination Stoudenmire testified in substance: When he first saw defendant at David White's house, he appeared as if he had been drinking very heavily. He interrogated him at the detective bureau at intervals for about three hours. Defendant then at all times denied seeing Libby on 5 June 1965. After talking with defendant that night he swore out a warrant against defendant charging him with the rape of Libby. When he talked with defendant on 8 June 1965, defendant was sober, and he read the warrant to him. He again explained to defendant his constitutional rights, and asked him if he knew what his rights were. Defendant said he did; he had consulted a lawyer.

After the examination and cross-examination of Stoudenmire on the *voir dire* were finished, the court asked defendant if he had any evidence to offer. Defendant's counsel replied, "None for the defendant."

The court then found as a fact that defendant freely and consciously consented for Stoudenmire to search his automobile, and the motion to suppress the evidence found as a result of such search is denied. Defendant excepted, and assigned this as error. The court further found as facts that the incriminatory statement by defendant to Stoudenmire was made freely and voluntarily without any threat or promise, and after defendant had been fully advised of his rights, and that such statements were voluntary statements and are competent evidence. Defendant excepted, and assigned this as error.

The jury was then called back into the courtroom, and Stoudenmire in their presence testified substantially as he did on the *voir dire* examination in respect to defendant's consenting to the search of his automobile, and finding a girl's panties therein, and as to defendant's denial of seeing Libby on 5 June 1965, and defendant's incriminatory statements made to him on the afternoon of 8 June 1965.

Glenn Glesne is a college graduate and majored in biology and minored in chemistry. He is employed by the State Bureau of Investigation as a laboratory analyst in the field of chemistry, blood, and body fluids. On 7 June 1965 detective sergeant Stoudenmire delivered to him two plastic bags, one containing clothing Stoudenmire obtained from Libby and one containing clothing obtained from defendant. He examined each of the items in these plastic bags, and found some reddish brown stains which he subjected to chemical analyses. He took a sample from the lining of defendant's trousers on the right fly where there was a stain, and this stained portion showed blood of human origin. He made a test of a stained portion midway on the front of Libby's dress, and found this to be blood of human origin. He ran a test from the back lower part of Libby's slip where there was a stain, and found blood of human origin.

Defendant's assignment of error to the denial of his motion to suppress the evidence of Stoudenmire's finding of a girl's panties in the back of defendant's car is overruled, for the reason that defendant voluntarily consented to the search. *S. v. McPeak,* 243 N.C. 243, 90 S.E. 2d 501; *S. v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506.

Defendant's assignment of error to the admission in evidence of defendant's confession is overruled. The evidence is ample to support the finding of fact by the trial judge that the confession was made freely and voluntarily without any threats or promises and after the defendant had been fully advised of his constitutional rights. This finding is, therefore, conclusive on appeal. *S. v. Gray,* 268 N.C. 69, 150 S.E. 2d 1; *S. v. Barnes,* 264 N.C. 517, 142 S.E. 2d

344; *S. v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572, 28 A.L.R. 2d 1104; *S. v. Roberts,* 12 N.C. 259.

The trial of the instant case having occurred prior to the announcement of the decision by the Supreme Court of the United States in *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, that decision has no application to this appeal. *Johnson v. New Jersey,* 384 U.S. 719, 16 L. Ed. 2d 882.

Mrs. Jacquelyn Moore Jackson, medical technologist at Rex Hospital, testified, without objection, that she received from Dr. Arthur Davis, associate pathologist at Rex Hospital, a test tube containing a swab with a cotton tip with Libby Beasley's name thereon, that she subjected it to an acid phosphatase test, found 6.8 Bodansky units of acid phosphatase, and reported the result of this test to Dr. Arthur Davis.

Dr. Arthur Davis, associate pathologist at Rex Hospital, and found by the trial court to be an expert in medicine, specializing in pathology, was asked this question by the State: "Do you have an opinion satisfactory to yourself as to the probable or likely source of acid phosphatase in the concentration of 6.8 Bodansky units in the area of the mouth of the womb of a female?" Over defendant's objection and exception, he was permitted by the trial court to answer as follows: "The presence of acid phosphatase in the concentration of 6.8 Bodansky units found in the vagina indicates the presence of male seminal fluid." Defendant assigns this as error. This assignment of error is overruled, for the particular matter as to the question asked Dr. Davis was one on which Dr. Davis could be helpful to the jury because of his superior knowledge, and his answer was competent in evidence. Stansbury, N. C. Evidence, 2d Ed., §§ 134 and 135, and cases cited under these sections; Mc-Cormick on Evidence, § 13 (1954), citing authorities.

Defendant assigns as error that Dr. Satterfield, over his objections and exceptions, was permitted to answer questions to the effect if he had an opinion satisfactory to himself from his examination of Libby and the information he had as to whether Libby's female organ was penetrated, and, if so, what it was penetrated by and as to the depth of the penetration. He replied in substance that in his opinion from the laboratory findings her female organ was penetrated full depth by a man's male organ.

Defendant contends that this challenged testimony of Dr. Satterfield is incompetent because he was permitted to give his opinion based upon his personal examination, and *the information he had,* which would permit him to rely upon rumor, defendant's purported confession, and other things. It is manifest that Dr. Satterfield was

asked to give a direct (not hypothetical) opinion on the basis of the report furnished him by Dr. Davis and Mrs. Jackson, supplemented by his general and pelvic examination of Libby Beasley, and the answers to the questions asked were based upon the report furnished him by Dr. Davis and Mrs. Jackson and his own personal examination. On the precise question raised by defendant's assignment of error to this testimony of Dr. Satterfield, counsel for the State and counsel for the defendant have not favored us with any citation of authority.

It is thoroughly established in our decisions that the admission of evidence which is not prejudicial to a defendant does not entitle him to a new trial. To warrant a new trial it should be made to appear by defendant that the admission of the evidence complained of was material and prejudicial to defendant's rights and that a different result would have likely ensued if the evidence had been excluded. *S. v. King*, 225 N.C. 236, 34 S.E. 2d 3; 1 Strong's N. C. Index, Appeal and Error, §§ 40 and 41.

Even if we concede that the challenged evidence of Dr. Satterfield was incompetent, McCormick on Evidence, § 15 (1954); 3 Wigmore on Evidence, 3d Ed., § 688 (4); 1966 pocket part to Conrad's Modern Trial Evidence, § 692; 2 Jones on Evidence, 5th Ed., § 421; *Summerlin v. R. R.*, 133 N.C. 550, 45 S.E. 898; *S. v. David*, 222 N.C. 242, 22 S.E. 2d 633; *Service Co. v. Sales Co.*, 259 N.C. 400, 413, 131 S.E. 2d 9, 20; *Branch v. Dempsey*, 265 N.C. 733, 747-48, 145 S.E. 2d 395, 405; *Keith v. Gas Co.*, 266 N.C. 119, 146 S.E. 2d 7; *Apel v. Coach Co.*, 267 N.C. 25, 147 S.E. 2d 566, we think, and so hold, that its admission in evidence was not prejudicial, and that it is likely a different result would not have been reached if this challenged evidence had been excluded, and we base our opinion and holding upon the following facts, which the State's evidence shows: (1) Dr. Satterfield testified that he obtained from right back of the mouth of the womb of Libby Beasley material for a test to be run in the laboratory of Rex Hospital to determine whether a male organ had been in this area; that Mrs. Jacquelyn Moore Jackson, a medical technologist at Rex Hospital and for eight years a clinical chemist there, testified without objection that she subjected this material obtained by Dr. Satterfield from Libby Beasley to an acid phosphatase test and found 6.8 Bodansky units of acid phosphatase. (2) Dr. Arthur Davis, associate pathologist at Rex Hospital, who received this material taken from the body of Libby Beasley by Dr. Satterfield, gave this material to Mrs. Jackson to test in the laboratory of Rex Hospital. Dr. Davis was asked this question: "Do you have an opinion satisfactory to yourself as to the probable or likely source of acid phosphatase in the concentration of 6.8 Bodansky

units in the area of the mouth of the womb of a female?" His answer, which we have held to be competent, was as follows: "The presence of acid phosphatase in the concentration of 6.8 Bodansky units found in the vagina indicates the presence of male seminal fluid." (3) Dr. Satterfield testified without objection in substance: His pelvic examination of Libby Beasley about 9:45 on 5 June 1965 disclosed the following: On the right hand side of the lip beside the birth canal, there was a skinned place where the superficial skin had been knocked off, about an inch and a half in length and half an inch in width. She had tears through the entire length of the hymenal ring. These tears were relatively fresh, and there was no evidence of any healing and no scab formation over the soft tissues of the skin. Along the vaginal canal there were more of these tiny "petechial hemorrhages" throughout the vagina and up into the area of the mouth of the womb. (4) Dr. Satterfield was asked this question: "From your findings do you have an opinion satisfactory to yourself as to whether or not the female organs of Libby Gray Beasley had previously been penetrated in this fashion by a foreign object?" There was no objection to this question and no motion to strike it out, and his answer was as follows: "I would say that they had not prior to the time in question." (5) G.S. 14-23 provides: "It shall not be necessary upon the trial of any indictment for the offenses of rape, carnally knowing and abusing any female child under twelve years old . . . to prove the actual emission of seed in order to constitute the offense, but the offense shall be completed upon proof of penetration only." This Court stated in *S. v. Jones*, 249 N.C. 134, 105 S.E. 2d 513: "The terms 'carnal knowledge' and 'sexual intercourse' are synonymous. There is 'carnal knowledge' or 'sexual intercourse' in a legal sense if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male. It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient." (6) Defendant on 8 June 1965 made a statement to detective sergeant Stoudenmire, which statement we have held to be competent in evidence, as follows: "(H)e attempted to get his penis into her vagina but could not get it in good and that he ceased." (7) The admission of Dr. Satterfield's challenged and incompetent testimony to the effect that Libby's female organ was penetrated by a man's male organ was rendered harmless by the admission of an overwhelming mass of other competent evidence offered by the State tending to show penetration of Libby's female organ by a man's male organ. This is said in 1 Strong's N. C. Index, Appeal and Error, § 41, p. 123: "Nor will the admission of incompetent evidence be held prejudicial when its import is abundantly established by competent testimony."

(Citing authority.) (8) Dr. Satterfield's challenged and incompetent testimony to the effect that there had been full penetration was not prejudicial because the State offered an overwhelming mass of other competent evidence tending to show full penetration, and because of the fact that by the provisions of G.S. 14-23 the offense charged in the bill of indictment shall be completed upon proof of penetration only. *S. v. Monds,* 130 N.C. 697, 41 S.E. 789.

The indictment here is drawn under the provisions of G.S. 14-21 and charges defendant with feloniously and carnally knowing and abusing Libby Gray Beasley, a female child under the age of twelve years, to wit, of the age of ten years. Consent is no defense, and this is true by virtue of the language of the statute. The court properly overruled defendant's motion for judgment of compulsory nonsuit and correctly submitted the case to the jury. *S. v. Wade,* 224 N.C. 760, 32 S.E. 2d 314.

We have carefully examined defendant's other assignments of error, some of which have no citation of authority to support his contentions. Such assignments of error merit no discussion and are overruled. The charge of the court is full, accurate, and impartial. All defendant's assignments of error have been examined and overruled. Nothing is shown in the record before us and defendant's brief which would justify disturbing the verdict and judgment below.

No error.