STATE OF NORTH CAROLINA v. LEWIS BURLEY FOUNTAIN

No. 13

(Filed 11 October 1972)

**1. Jury § 2— exhaustion of original venire — additional jurors selected — no error**

Defendant in a first-degree murder prosecution was not prejudiced by the selection of ten additional jurors from the jury list after the original venire was exhausted where defendant failed to move for a continuance in order to review the names of the additional jurors, where the record does not show that the clerk failed to read over the names of the additional jurors in the presence and hearing of defendant and his counsel before the jury was impaneled, and where the record did not reveal the acceptance of any juror after the exhaustion of defendant's peremptory challenges. G.S. 9-21; G.S. 9-11.

**2. Criminal Law § 73— testimony outside personal knowledge of witness — hearsay testimony properly excluded**

The defendant's attempt to establish the existence of a shotgun or shell casing through witnesses who stated they had no personal knowledge concerning the matter was properly excluded by the trial court in a murder prosecution, as such testimony would have been hearsay evidence.

**3. Criminal Law § 162— appeal — evidentiary questions — assignment or error — requirements**

When a record fails to show what the witness would have testified had he been permitted to answer questions objected to, the exclusion of such testimony is not shown to be prejudicial; an assignment of error which does not set out the excluded evidence but merely refers to the record page where the asserted error may be discovered is not sufficient.

**4. Criminal Law § 88— cross-examination — denial of prior convictions — "sifting the witness" proper**

The trial court did not err in permitting a solicitor to further cross-examine defendant witness concerning an alleged prior conviction after defendant denied having been convicted of the crime where the solicitor acted in good faith and with information concerning the crime and where the solicitor's questions amounted to a "sifting of the witness" in light of evasive and equivocal answers given by the witness.

**5. Homicide § 21— first-degree murder — sufficiency of State's evidence to withstand nonsuit**

> Defendant's motion for nonsuit in a first degree murder prosecution, made at the close of all the evidence, was properly denied where the evidence was sufficient to permit a jury finding of premeditation and deliberation in that it tended to show that the defendant and deceased had had previous difficulties, that ill will existed between the two and that the younger male defendant inflicted seventeen separate knife wounds upon the older female victim.

APPEAL by defendant from *Long, J.,* 17 January 1972 Criminal Session of ROCKINGHAM Superior Court.

Defendant was tried upon a bill of indictment charging him with the murder of Vera Parker. He entered a plea of not guilty.

The State offered evidence which, in substance, is as follows:

Curtis Parker testified that on 28 August 1971 he had been harvesting tobacco, and that late in the afternoon he went to his house and sent his wife and daughter to light the fire at the tobacco barn. Later, as a result of a conversation with his daughter, Dorothy, he went out and found his wife's body lying three or four feet from the edge of the road. She was dead. He had earlier seen defendant, Lewis Burley Fountain, his daughter Dorothy, and some of their children standing across the road near the place where he found his wife's body. Dorothy was married to defendant; they had been separated for about four years, and their eight children lived at the Parker residence. Curtis Parker thereafter testified that he kept a shotgun and rifle locked up in a wardrobe, and after he heard what had happened he unlocked the wardrobe and obtained the shogun.

Dr. Paul Mabe, a practicing physician and Assistant Medical Examiner for Rockingham County, testified that he examined the body of Vera Parker in the Annie Penn Memorial Hospital at Reidsville on the night of 28 August 1971. In his opinion her death resulted from shock due to loss of blood caused by some seventeen lacerations or stab wounds. He described the wounds as follows:

> "One laceration was noted over the posterior of the scalp, the base of the skull area, which was approximately some two inches in length; there were two facial lacera-

tions, over the left side of the face, approximately four or five inches in length the longer one, two six inch deep lacerations over the left posterior shoulder, over the upper back area off on the left, they were quite deep extending through not only the skin and through the muscle but not into the chest cavity, two small lacerations over the left shoulder, one ten inch laceration over the left chest wall extending around the left lateral side of the chest wall, two eight inch deep lacerations over the right anterior chest area over the right front part of the chest, one penetrating in the chest cavity on the right.

"There were five small lacerations over the anterior chest, two, three to four inch lacerations over the upper abdomen, one penetrating into the right abdomen cavity and two lacerations of the left forearm and hand. . . . "

In his opinion deceased could not have lived over four or five minutes after receiving the injuries.

Florence Parker stated that at the request of her father, Curtis Parker, she and her mother went to light the fire at the tobacco barn. On the way to the barn she saw defendant, his wife Dorothy, and their sons Richard and Burley, Jr., across the road near a patch of pine trees. Defendant had a knife on Dorothy's throat and at that time her mother, Vera Parker, went toward Burley, telling him "not to do that, that he was not supposed to be there, and that she did not want any trouble." Defendant pushed his wife aside, went toward Vera Parker and cut and stabbed her. She (Florence) pulled on Burley until she fell down. Dorothy ran toward the house, and after Vera Parker fell to the ground, Burley left.

Florence said on cross-examination that defendant did not go to Vera Parker, but that Vera Parker was going toward Burley. She did not see a shotgun at the scene. She stated that defendant and her mother had previously had trouble and that defendant had shot into their house four times. On another occasion her mother had shot Burley.

Deputy Sheriff Duke Setliff testified that he arrived at the scene of the killing at 9:00 p.m. He described the condition of the deceased's body and stated that when the body was removed a bloody knife blade was found where the body had been. The blade was a little over four inches long.

Burley Fountain, Jr., aged eight, testified that defendant cut Vera Parker, and at that time Vera was not doing anything to defendant, but that Florence Parker was hitting defendant on the back during the time he was cutting Vera. On cross-examination he stated that he was playing ball in the house and later returned to the place of the cutting with his mother.

Deputy Sheriff Setliff was recalled, and further cross-examination of him revealed that on the night of 28 August 1971, at about 10:15 p.m., after he had warned defendant Burley Fountain of his constitutional rights, defendant made a statement. In essence, the statement was that defendant was visiting with his wife and children across the road from the Parker house when Vera Parker came out of the house "fussing and arguing." She threatened that if he came to the house she would kill him. Vera later came out of the house, fired a shotgun, and threw it to the ground. Florence picked up the gun and started to beat him on the head with it while Vera held him. After stabbing Vera until she fell to the ground, he left.

Deputy Sheriff Edward Page, testifying for defendant, stated that Burley Fountain arrived at his (Page's) home at about 9:30 p.m. on 28 August, 1971. He told the officer about the cutting and voluntarily placed himself in custody. Deputy Sheriff Page later returned to the scene searching for a knife blade, because Burley Fountain had told him "he cut her until the blade came out of the knife." He found a 12-gauge shotgun shell lying on the ground about four feet from the blood.

Glynton Strader testified that on 28 August 1971 Burley Fountain had worked with him in the tobacco field, and that he had put defendant off near the Parker home in later afternoon. Strader returned to the scene of the killing a short time thereafter and found Curtis Parker and Eugene Troxler in possession of firearms. The guns, an empty single shot 12-gauge shotgun and a loaded .22 rifle, were given to him.

Dr. Evans Charles Fowler, a psychiatrist employed at Cherry Hospital in Goldsboro, in pertinent part testified:

" . . . I made these determinations. The diagnosis was: Primary: Schizophrenia, Residual type, Non-Psychotic. Secondary: Mental retardation, Mild to borderline. Another doctor and myself saw Fountain and the disposition was

---

State v. Fountain

---

signed by both of us. It reads: 'It is our opinion that this subject, Lewis B. Fountain, is able to differentiate between right and wrong and further that he can understand the probable consequences of his acts and is able to plead to the indictment pending against him. It is further our opinion that he is able to consult with counsel in the preparation of his own defense.' "

Defendant testified that he was married to Vera Parker's daughter, Dorothy, and that they had eight children. He stated that on 28 August 1971 Mr. Strader let him off at the Parker mailbox, and his children and wife walked across the road where he usually met them. He saw Vera Parker near the house and heard her say, "If that s.o.b. don't leave from here I am going to kill him." He paid no attention to what Vera Parker said. Later, he looked up and saw Vera Parker pointing a shotgun at him. At this time he grabbed his wife and backed up. He had a knife out. Vera Parker fired the shotgun and grabbed him. Florence then began beating on his back with the shotgun, and during "the shuffle" he cut Vera Parker several times.

On cross-examination defendant testified that he weighed 216 pounds and was six feet two inches tall. He admitted having been convicted of assaulting his wife on numerous occasions and having been convicted of various misdemeanors. He was on probation when he killed Vera Parker.

The jury returned a verdict of guilty of first degree murder with a recommendation for life imprisonment. Defendant appealed from judgment imposing the mandatory life sentence.

*Attorney General Morgan and Assistant Attorney General Hafer for the State.*

*Benjamin R. Wrenn, Court-Appointed Attorney, for defendant.*

BRANCH, Justice.

Defendant assigns as error the failure of the trial court to grant his motion for mistrial.

[1]   In selecting the jury the original venire was exhausted, and Judge Long ordered that ten additional jurors be selected from the jury list in the same manner as provided for the

selection of regular jurors. Defendant objected to the drawing of the additional jurors and on the next day moved for a mistrial on the ground that the tales jurors were not called as members of the original venire prior to the seating of any jurors. Defendant relies on the provisions of G.S. 9-21, which provides:

> Peremptory challenges in criminal cases.— (a) In all capital cases each defendant may challenge peremptorily without cause 14 jurors and no more. In all other criminal cases each defendant may challenge peremptorily six jurors without cause and no more. *To enable defendants to exercise this right, the clerk shall read over the names of the jurors on the panel, in the presence and hearing of the defendants and their counsel, before the jury is impaneled.* (Emphasis ours.)

> (b) In all capital cases the State may challenge peremptorily without cause six jurors for each defendant and no more. In all other criminal cases the State may challenge peremptorily without cause four jurors for each defendant and no more. The State's challenge, peremptory or for cause, must be made before the juror is tendered to the defendant. The State does not have the right to stand any jurors at the foot of the panel.

G.S. 9-11 provides:

> Supplemental jurors; special venire.— (a) If necessary, the court may, without using the jury list, order the sheriff to summon from day to day additional jurors to supplement the original venire. Jurors so summoned shall have the same qualifications and be subject to the same challenges as jurors selected for the regular jury list. If the presiding judge finds that service of summons by the sheriff is not suitable because of his direct or indirect interest in the action to be tried, the judge may appoint some suitable person in place of the sheriff to summon supplemental jurors. The clerk of superior court shall furnish the register of deeds the names of those additional jurors who are so summoned and who report for jury service.

> (b) The presiding judge may, in his discretion, at any time before or during a session direct that supplemental jurors or a special venire be selected from the jury list

in the same manner as is provided for the selection of regular jurors. Jurors summoned under this subsection may be discharged by the court at any time during the session and are subject to the same challenges as regular jurors, and to no other challenges.

The language of G.S. 9-11 is clear and unambiguous, and its provisions authorize the trial judge to order the summonsing of supplemental jurors in order to insure orderly, uninterrupted, and speedy trials.

This Court is without power to interpolate or superimpose provisions not contained in a clear and unambiguous statute. *Utilities Comm. v. Electric Membership Corp.,* 275 N.C. 250, 166 S.E. 2d 663; *N. C. Board of Architecture v. Lee,* 264 N.C. 602, 142 S.E. 2d 643.

In construing statutes dealing with similar subject matter, the statutes must be construed in *pari materia* and harmonized so as to give effect to each other. *Utilities Comm. v. Electric Membership Corp., supra; Gravel Co. v. Taylor,* 269 N.C. 617, 153 S.E. 2d 19.

The procedure of impaneling a jury is not statutory but is an ancient rite still in general use in the courts of this State. It is the final procedure or ceremony in the formation of a jury.

The provisions of G.S. 9-11 and G.S. 9-21 are easily harmonized. The requirement in G.S. 9-21 that the clerk read the names of the jurors to enable defendants to exercise their rights of challenge before the jury is impaneled applies to original venires and additional venires with equal force, and relates to the time before the jury is finally formed. Clearly the purpose of this provision is to keep the defendant and his counsel informed as to the composition of the jury venires until the time the jury is impaneled.

We have been unable to find any authority in this jurisdiction as to the precise issue here presented. We do find authority from other jurisdictions supporting the general rule that an accused is not prejudiced because he is not furnished a list of persons called as supplemental jurors where it became necessary to summons them after the court had properly excluded jurors from the original venire. 47 Am. Jur. 2d, Jury § 162;

*Demato v. People,* 49 Colo. 147, 111 P. 703; *State v. McKee,*
170 La. 630, 128 So. 658; *Makley v. State,* 49 Ohio App. 359,
197 N.E. 339.

Instant record shows that defendant failed to move for a
continuance in order to review the names of the additional
jurors drawn upon order of the trial judge. The record does
not reveal that the clerk failed to read over the names of the
additional jurors in the presence and hearing of defendant and
his counsel before the jury was impaneled. Further, defendant
has failed to show any prejudice since the record does not
reveal the acceptance of any juror after the exhaustion of his
peremptory challenges. To follow defendant's contention would
result in a procedure which would impede the orderly dispatch
of court business and defeat the primary purpose of our court
system: to afford defendants fair and speedy trials.

We find no merit in this assignment of error.

[2] Defendant next assigns as error the action of the trial
judge in sustaining the State's objection to cross-examination of
Florence Parker and Deputy Sheriff Setliff concerning a shot-
gun and shotgun shell casing purportedly found at the scene of
Vera Parker's death.

On cross-examination of the witness Florence Parker, the
following occurred:

> Q. Now you say that you don't know anything about
> a shotgun?

> A. No, sir, but they said one was out there.

> Q. Who is they?

> SOLICITOR SCOTT: Objection to what somebody said,
> if she does not know about it.

> COURT: Sustained.

> EXCEPTION No. 2.

The same type question was put to Deputy Sheriff Setliff
concerning the shell casing. He had previously answered that
he had no personal knowledge of the existence of a shell casing
at the scene, but that someone had told him one was there.

Defendant in both instances attempted to establish the existence of the shotgun or shell casing through witnesses who stated they had no personal knowledge concerning the matter. Had the court allowed defendant to elicit this testimony as to what someone other than the witnesses personally knew about the shotgun or the shell casing, it would clearly have been hearsay evidence. 2 Strong's N.C. Index 2d, Criminal Law § 73, p. 572; Stansbury, N.C. Evidence 2d, Hearsay § 138, pp. 335-339.

[3] In any event, the record on appeal does not show what the responses to these questions would have been.

It is well recognized that when a record fails to show what the witness would have testified had he been permitted to answer questions objected to, the exclusion of such testimony is not shown to be prejudicial. This rule applies to questions asked on direct and cross-examination. *State v. Fletcher* and *State v. St. Arnold,* 279 N.C. 85, 181 S.E. 2d 405; *State v. Kirby,* 276 N.C. 123, 171 S.E. 2d 416.

This assignment of error does not set out the excluded evidence but merely refers to the record page where the asserted error may be discovered. This is not sufficient. *State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561; Rule 19 (3), Rules of Practice in the Supreme Court of North Carolina.

This assignment of error is overruled.

[4] By his Fifth Assignment of Error defendant asserts that the trial court erred in allowing the solicitor to further cross-examine defendant concerning an alleged prior conviction after defendant denied having been convicted of the crime. We quote portions of the record pertinent to this contention:

Q. State to the court and the jury whether or not you were indicted and convicted for shooting into the home down there?

A. They say that I shot into it but I didn't.

Q. Were you convicted of that?

A. Er, no.

Q. Were you convicted or did you plead guilty?

A. I was not convicted of it.

Q. Did you plead guilty?

A. I don't remember.

Q. That was in Caswell County that I am talking about and you don't remember whether you were —

ATTORNEY WRENN: Objection, the solicitor is bound by the answer of the defendant, your Honor.

COURT: Overruled.

EXCEPTION No. 7.

I did not plead guilty of shooting into no house. The court made some sort of settlement or something. I do not know what kind of a settlement it was. It did not involve me. I don't know if I pleaded guilty in May, 1971 or shooting into the house of Vera Parker. I do not remember who the judge was. I was on probation at the time I killed Vera Parker. I was not at Vera Parker's home. One of the conditions of my probation was that I was not to go to Vera Parker's home or molest her.

Q. And I will ask you now even if you went not convicted, I will ask you if you did not actually shoot into the home of Vera Parker on the 20th day of February, 1971?

A. I did not.

ATTORNEY WRENN: Objection.

COURT: Overruled.

EXCEPTION No. 8.

.  .  .  .

Q. You pled guilty?

A. No, I did not plead guilty to shooting in no house.

Q. Can you read? You can write, can't you, look at that did you sign that?

A. I might have signed that but I have signed a lot of forms here that I don't really understand.

Q. Did you sign that?

A. That is my signature on that.

Q. Don't you know that is a transcript of a plea of guilty to the felony of discharging a firearm in an occupied dwelling wasn't it?

A. I signed a stack of forms here but I never read a line, they said signed it here.

Q. Didn't the judge read it over to you and ask you if you agreed to it or not?

A. I don't know.

Q. And you answered, "Yes, sir," didn't you?

A. I signed some forms here and they were not read or nothing.

ATTORNEY WRENN: I object, he is asking the man what he was tried and convicted of for one purpose and I asked the Court to instruct the jury about that, but I renew my objection to this line of questioning.

SOLICITOR SCOTT: The State is trying to do several things among others, to show motive.

COURT: Overruled.

EXCEPTION NO. 9.

When a defendant in a criminal action elects to take the stand and testify, he is subject to impeachment as other witnesses, including impeachment by cross-examination concerning prior criminal convictions. *State v. Williams,* 279 N.C. 663, 185 S.E. 2d 174; *State v. Sheffield,* 251 N.C. 309, 111 S.E. 2d 195. However, cross-examination as to prior convictions must be made in good faith and be based on information. *State v. Heard,* 262 N.C. 599, 138 S.E. 2d 243; *State v. Sheffield, supra.*

"It is a general rule of evidence in North Carolina 'that answers made by a witness to collateral questions on cross-examination are conclusive, and that the party who draws out such answers will not be permitted to contradict

them; which rule is subject to two exceptions, first, where the question put to the witness on cross-examination tends to connect him directly with the cause or the parties, and second, where the cross-examination is as to a matter tending to show motive, temper, disposition, conduct, or interest of the witness toward the cause or parties.' *State v. Jordan,* 207 N.C. 460, 177 S.E. 333 (1934)." *State v. Long,* 280 N.C. 633, 187 S.E. 2d 47.

However, this does not preclude the solicitor from pressing or "sifting the witness" by further cross-examination. *State v. Robinson,* 272 N.C. 271, 158 S.E. 2d 23; *State v. King,* 224 N.C. 329, 30 S.E. 2d 230. The extent of cross-examination rests largely in the discretion of the trial judge. *State v. Bumper,* 275 N.C. 670, 170 S.E. 2d 457; 7 Strong's N.C. Index 2d, Witnesses § 8, p. 703.

The record shows that the solicitor acted in good faith and had information concerning the crime to which his examination was directed. There was no abuse of discretion on the part of the trial judge in allowing the solicitor to "sift the witness" in light of the evasive and equivocal answers given by the witness.

We note that, in most instances, the answers were given long before objection was interposed, and the objection was thereby waived. *State v. Sanders,* 276 N.C. 598, 174 S.E. 2d 487.

Although we do not commend the use by the solicitor of defendant's signature on the purported transcript of the guilty plea during his cross-examination of defendant, we are unable to find anything in this assignment of error so material and prejudicial that a different result would likely have been reached had the solicitor not pursued this line of questioning. *State v. Temple,* 269 N.C. 57, 152 S.E. 2d 206.

This assignment of error is overruled.

Defendant assigns as error the denial of his motion for judgment as of nonsuit at the close of the State's evidence and at the close of all the evidence.

[5]  Defendant argues that the trial judge should have allowed his motion as to first degree murder since there was not sufficient evidence of premeditation or deliberation.

First degree murder is the unlawful killing of a human being with malice and premeditation and deliberation. *State v. Duboise,* 279 N.C. 73, 181 S.E. 2d 393; *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65; *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652. Thus, the question presented by this assignment of error is whether the State has presented such substantial evidence as would permit a jury to find that defendant, after premeditation and deliberation, formed a fixed purpose to kill and thereafter accomplished his purpose. *State v. Reams, supra; State v. Walters,* 275 N.C. 615, 170 S.E. 2d 484; *State v. Robbins, supra.*

Premeditation means "thought beforehand for some length of time, however short." *State v. Reams, supra; State v. Benson,* 183 N.C. 795, 111 S.E. 869.

"Deliberation means that the act is done in a cool state of blood. It does not mean brooding over it or reflecting upon it for a week, a day, or an hour, or any appreciable length of time, but it means an intention to kill, executed by the defendant in a cool state of the blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation." *State v. Reams, supra; State v. Benson, supra.*

The elements of premeditation and deliberation are not ordinarily susceptible to direct proof, but are inferred from various circumstances, such as ill will, previous difficulty between the parties, or evidence that the killing was done in a vicious and brutal manner. *State v. Duboise, supra; State v. Reams, supra; State v. Hamby,* 276 N.C. 674, 174 S.E. 2d 385; *State v. Stanley,* 227 N.C. 650, 44 S.E. 2d 196; *State v. Watson,* 222 N.C. 672, 24 S.E. 2d 540.

This record is replete with evidence of previous difficulties between defendant and Vera Parker. It also clearly shows the existence of ill will between them. Defendant, who was 32 years old, weighed 216 pounds, and stood six feet two inches in height, savagely and brutally inflicted seventeen separate

knife wounds upon the 45-year-old Vera Parker. By his own statement "he cut her until the blade came out of his knife."

There was sufficient substantial evidence to permit a jury to find that after premeditation and deliberation defendant formed a fixed purpose to kill Vera Parker. The trial judge correctly overruled defendant's motion for nonsuit.

Our examination of the entire record reveals nothing which would justify disturbing the verdict and judgment in this case.

No error.