STATE OF NORTH CAROLINA v. ARTHUR S. GATLING AND CLARENCE B. BANKS

No. 30

(Filed 19 November 1969)

1. Criminal Law § 66— in-court identification — previous identification at jail — right to counsel — totality of circumstances

Where a robbery victim promptly recognized defendants and identified them as his assailants as they entered the county jail in custody of police officers some four hours after the robbery, defendants and the car

in which they were found when arrested fit descriptions the victim had previously given officers, defendants were wearing the same clothes they had worn during the robbery, the victim's wallet was found in defendants' car where he said he had hidden it, and a straight razor similar to the one used in the robbery was found in the pocket of one defendant, the trial court properly allowed the victim to testify as to the out-of-court identification and to make an in-court identification of defendants, notwithstanding defendants were not represented by counsel at the out-of-court identification, the decisions of *Wade* and *Gilbert* relating to police identification lineups being inapplicable, the identification at the jail not having taken place under circumstances "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to be a denial of due process, and the in-court identification being based on the victim's observation of defendants while their captive rather than on the harmless "confrontation" at the jail.

**2. Criminal Law § 168— instructions — contextual construction**

A charge will be construed contextually, and isolated portions will not be held prejudicial when the charge as a whole is correct.

**3. Criminal Law § 168— instructions — mere technical error**

Technical errors in the charge which are not substantial and which could not have affected the result will not be held prejudicial.

**4. Criminal Law § 168— instructions — harmless and prejudicial error**

In this armed robbery prosecution, portion of the charge with respect to Daylight Saving and Eastern Standard Time is not prejudicial when considered in context.

APPEAL by defendants from decision of the Court of Appeals upholding judgment of *Burgwyn, E.J.,* at the 2 December 1968 Criminal Session, ONSLOW County Superior Court.

Defendants were tried upon a bill of indictment charging them with common-law robbery of Milton J. Russell, Jr., on 24 October 1968.

The State's evidence tended to show that on 24 October 1968 Milton J. Russell, Jr. (Russell), a member of the United States Coast Guard, was hitchhiking from Morehead City to Jacksonville to buy a car. He was picked up around 3:00-3:30 p.m. near the main gate of Camp Lejeune Marine Base by two colored men wearing marine utility clothes and driving an old model, white, two-door Pontiac. Russell sat in the rear seat and, replying to questions, told the men he was going to look at some cars. They let Russell out near his destination and he walked a short distance to Cars Incorporated where he made a down payment on a car. The car dealer drove him back to a point near the main gate of the Marine Base and put him out around 4:15-4:30 p.m. About five minutes later

the same two men in the same car, but this time wearing civilian clothes, picked him up again. As they rode along the men asked Russell if he had any loose change as they needed some gas money. Russell got a quarter from his pocket and one of them took it. The car turned off the Morehead City highway and took a road that led to a housing development. Russell asked to get out, saying he had to get back to his ship at Morehead City. The men stated they would let him out in a minute. Russell realized they did not intend to stop and that something was wrong. When circumstances permitted, he removed his wallet containing $105.00 from his pocket and slipped it beneath the passenger side of the front seat.

The car continued on a circuitous route and finally stopped in a secluded spot on a back road. Russell told the men he was scared. They replied that they needed money and wanted what he had. Russell said he had only loose change and held out 80¢ in his hand to show them. They took the 80¢ and threw it in the front seat area of the car. Then one of them pulled a straight razor from his pocket and they passed it back and forth while questioning Russell about his prejudices and about money. Russell pulled out his pockets and even took down his socks to show them he had no money. The driver demanded and took Russell's Timex watch valued at $25.00. Then they struck him in the face and side and told him to get out of the car. He left the car and ran into the woods with the driver chasing him. The driver then abandoned the chase, ran back to the car, and drove rapidly away. Russell ran toward the car to verify its make, year and model, if possible, and to check its color and get the license number. It was a white car with a Virginia tag. He got only the first letters and digits of the license number before the car went out of sight.

Russell started walking up the road and hailed a passing State Highway Patrol car. Telling the patrolman he had been robbed, he related facts substantially as above set out. He had bruise marks on his face and was visibly upset. He gave the officer a description of the car and gave him "A-157" which was all of the license number he was able to get. They rode around the area for a few minutes and the patrolman took Russell to the Sheriff's Office at the jail where he told the Sheriff what had happened. He remained there until about 8:30 p.m.

Later the same day an employee of the Merchant Patrol, who had received information of the robbery and a description of the car, called the Sheriff's Office by radio and stated he had found a car fitting the description. In response to that call, Kenneth Gray

Midgette and Arthur Marshburn, deputy sheriffs, went to the Van Nessa Club on Bell Fork Road. There they found a two-door 1961 model Pontiac, white or beige with brown top, bearing Virginia license A-157993. Defendant Gatling was seated under the wheel. Defendant Banks' was beside him on the front seat. A Marine named J. F. Thompson was seated in the back seat and got out when the officers first arrived. He was not detained because defendants stated he had not been with them that day. Officer Midgette asked Gatling for his driver's license and ascertained from it that the car was registered in Gatling's name. He asked permission to search the car and Gatling replied, "Sure, go right ahead." The officer felt under the driver's seat and found nothing. He then got in the back seat on his knees and on the right side underneath the front seat found a wallet containing $105.00 together with Russell's Government driver's license, a Government Motor Vehicle Identification card, and a picture of Russell's girl friend. Officer Marshburn got defendant Banks out of the car on the other side, and the two defendants were thereupon informed that they were under arrest for armed robbery.

Upon arrival at the jail, defendants were searched by officers who discovered a straight razor in Banks' right rear pocket. Russell's watch was not found at that time. In the presence of these officers, Russell looked at the car parked in front of the jail and positively identified it as the car in which he was riding at the time he was robbed. He also positively identified Gatling and Banks as the men who robbed him. It was then about 8:30 p.m. and three to four hours had elapsed since Russell watched them drive away following the robbery. Defendants were dressed in the same clothes they were wearing when Russell last saw them that afternoon.

Defendants were driven from the Van Nessa Club to the jail in Officer Marshburn's car. They were seated in the back seat. A search of defendants at the jail failed to reveal Russell's watch. Two days later G. L. Maddox, a bondsman, found the watch in the back seat of Marshburn's automobile and handed it to Officer Marshburn. Maddox picked the watch up off the floor. Several other people had been in the back seat during the two-day period. It was a Timex watch with a black face, and Russell identified it as the one he owned or one just like it. At the trial the watch, the wallet, and the straight razor were offered in evidence.

Evidence for the defendants consisted of the testimony of Arthur Gatling, J. F. Thompson and Reginald McEchin. Gatling testified that he and Banks were members of the United States Marine

Corps. On 24 October 1968 he worked under the gunnery sergeant at the armory from 1:00 p.m. to 4:25 p.m. when he quit, got defendant Banks, and "started walking to get a ride into town to get my car." He had been storing his car in Jacksonville and not on the Marine Base because he didn't have insurance. A sergeant picked them up and they arrived in Jacksonville "about five o'clock." They got his car and returned to the Marine Base for "field day" at six o'clock. After field day, where he stayed until eight o'clock, defendants and Pfc. J. F. Thompson went to Van Nessa's where defendants were arrested.

Defendant Gatling further testified that he did not rob Russell and had never seen him, his watch, or his wallet prior to being arrested. He further swore that the officers searched his car without permission and, in that connection, said: "There wasn't any wallet in my car. There couldn't have been one there. I think that the officer planted it there. He got the wrong persons, whoever he tried. The billfold was not in my car. Banks had the razor in his hip pocket. I had never seen the razor before. It was a straight razor. He was supposed to get it sharpened for a friend. . . . I had the keys to my car that evening. I had not let anyone else have them. No one else would have been driving my car at 4:00 o'clock or 4:30. I don't know about 3:00 o'clock. I was the only one who had the keys."

J. F. Thompson testified that he "had been with Gatling and Banks since we left field day around eight o'clock. We left the field day and went to a place behind the Van Nessa's and stayed there a few minutes and then the officers came up." He stated that he did not put the wallet under the seat.

Reginald McEchin testified that he was acting N.C.O. in charge of Headquarters Battalion on October 24; that Gatling was assigned to a working party along with several other persons and worked at the armory on that date from 1:00 to 4:00 p.m. "The armory is about six miles from the main gate. It would take from ten to fifteen minutes to get from the armory to the main gate. I don't remember seeing Banks on this date. I remember Gatling working from one-four o'clock. I don't know where he went when he left. . . . I don't remember if we were on Daylight Saving Time at that time."

Defendant Banks did not testify.

Officer Midgette, recalled in rebuttal, reiterated that he sought and was given permission by Gatling to search the car. He was corroborated in this respect by Officer Marshburn.

The jury returned a verdict of guilty and a prison sentence of six to ten years as to each defendant was imposed by the court. Defendants appealed to the Court of Appeals where the conviction and sentence was upheld, 5 N.C. App. 536, 169 S.E. 2d 60. The case is now before us on appeal, defendants alleging involvement of a substantial constitutional question.

*John H. Harmon, Attorney for defendant appellants.*

*Robert Morgan, Attorney General, and (Mrs.) Christine Y. Denson, Staff Attorney, for the State.*

HUSKINS, J.

[1]    Within four hours after the victim was beaten and robbed, defendants were apprehended and brought to the county jail. The victim, already there, promptly recognized defendants and identified them as his assailants. He so testified at the trial and over objection made an in-court identification of the robbers. Defendants contend this violated their constitutional right under the Sixth and Fourteenth Amendments to the presence of counsel at such a "pretrial confrontation." Admission of this evidence is assigned as error, defendants relying on *United States v. Wade,* 388 U.S. 218, 18 L. ed 2d 1149, 87 S. Ct. 1926; *Gilbert v. California,* 388 U.S. 263, 18 L. ed 2d 1178, 87 S. Ct. 1951; *Stovall v. Denno,* 388 U.S. 293, 18 L. ed 2d 1199, 87 S. Ct. 1967, and the decision of this Court in *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581. This requires an examination of the cases cited.

In *Wade* the facts were that more than seven months after the robbery of a bank and sixteen days after Wade had been charged with the crime and counsel had been appointed to represent him, a lineup was arranged by the police and conducted without notice to Wade or his counsel. Two bank employees observed the lineup composed of the accused and five or six other persons in which all were required, like the robber, to wear strips of tape on their faces and to say the words allegedly uttered by the robber. The two employees identified Wade as the robber and later at the trial identified him in court. It was held that the out-of-court identification at the police lineup was a "critical" stage of pretrial proceedings and that the Sixth Amendment required the presence of counsel unless knowingly and intelligently waived. The case was remanded for a voir dire hearing to determine whether the in-court identifications were based on other observations of Wade rather than on the lineup identification and to determine whether, in any event, the introduction of the lineup identification constituted harmless error.

In *Gilbert,* an Alhambra savings and loan association office was robbed on 3 January 1964. On 26 March 1964 after Gilbert had been indicted and after counsel had been appointed to represent him, a lineup was conducted by the police in an auditorium used for that purpose. "Some ten to thirteen prisoners were placed on a lighted stage. The witnesses were assembled in a darkened portion of the room, facing the stage and separated from it by a screen. They could see the prisoners but could not be seen by them. State and federal officers were also present and one of them acted as 'moderator' of the proceedings. . . . Either while the men were on the stage, or after they were taken from it, it is not clear which, the assembled witnesses were asked if there were any that they would like to see again, and told that if they had doubts, now was the time to resolve them. Several gave the numbers of men they wanted to see, including Gilbert's. While the other prisoners were no longer present, Gilbert and 2 or 3 others were again put through a similar procedure. Some of the witnesses asked that a particular prisoner say a particular phrase, or walk a particular way. After the lineup, the witnesses talked to each other; it is not clear that they did so during the lineup. They did, however, in each other's presence, call out the numbers of men they could identify." *Gilbert v. California, supra* (388 U.S. 263, 270, footnote 2).

Gilbert's counsel was neither notified nor present at a lineup attended by approximately one hundred persons, purportedly eyewitnesses to one of many robberies with which Gilbert was charged. In addition to identifying Gilbert in court at the trial, three witnesses testified that they had observed and identified him as the Alhambra robber at the auditorium lineup. The Supreme Court of the United States held that such lineup procedures for identification purposes, conducted without notice to and in the absence of counsel, was a violation of Gilbert's constitutional right to counsel under the Sixth and Fourteenth Amendments and called into question the admissibility of the in-court identifications of Gilbert by the three lineup witnesses. The case was remanded for a determination of whether the in-court identification by the three lineup witnesses had an independent origin or was tainted by the illegal lineup and therefore incompetent.

In *Stovall,* about midnight on 23 August 1961 a doctor was murdered and his wife stabbed eleven times requiring major surgery to save her life. Two days later a Negro suspect was taken to her hospital room by five policemen and two members of the district attorney's staff. The suspect was afforded no time to consult or retain counsel. He was the only Negro in the room and was handcuffed

to one of the officers. At their direction he spoke a few words for voice identification. An officer asked her whether he "was the man" and she identified him from her hospital bed. At the trial she made an in-court identification and testified to her hospital room identification. Stovall was convicted and sentenced to death. After exhausting state remedies he petitioned the United States District Court for the Southern District of New York for habeas corpus. His petition was dismissed and the Circuit Court of Appeals for the Second Circuit affirmed (355 F. 2d 731). On certiorari the Supreme Court of the United States affirmed on the ground that the exclusionary rule enunciated in *Wade* and *Gilbert* was not retroactive and affected only confrontations conducted after 12 June 1967. Commenting upon pretrial confrontations the court said: *"Wade* and *Gilbert* fashion exclusionary rules to deter law enforcement authorities from exhibiting an accused to witnesses before trial for identification purposes without notice to and in the absence of counsel." Commenting further, the court said: "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it. . . ."

In *State v. Wright, supra,* the victim was assaulted on the night of 22 July 1967 and a lineup was conducted on 20 August 1967. After being fully warned of his rights and with his oral consent and waiver of counsel, Wright was placed in a lineup of ten persons. The victim said she could not identify her assailant but would be able to do so if she could hear him talk and see him walk. Wright was thereupon taken to a small room, shown singly to the victim, and required to walk and talk in her presence. On the basis of this private confrontation, the victim identified Wright as her assailant. We held that the proceeding lost its character as a pretrial investigative procedure and became a critical stage requiring the presence of counsel. Such illegal out-of-court identification rendered her in-court identification incompetent unless it could be shown that it had an independent origin and did not result from the illegal out-of-court confrontation.

[1] By comparison, in the case before us there was no lineup; nor were defendants "shown singly" for identification purposes. They were taken to the jail for incarceration — not for identification. Russell's presence there was not prearranged by the officers. He had remained there of his own volition after reporting the robbery. He promptly, and without hesitation, identified defendants when they entered the room less than four hours after he had ridden and talked

with them. His memory was still fresh. Defendants were wearing the same clothes they wore when they robbed him. They fit the description he had previously given the officers, as did Gatling's car. Russell's wallet was found in the car exactly where he said he had hidden it. He had been intimidated with a straight razor — Banks had a straight razor in his pocket. This is a far cry from the facts in *Wade* and *Gilbert* and certainly is not the type of confrontation for identification purposes which those cases were designed to deter. In our view *Wade* and *Gilbert* do not encompass and have no application to the facts in this case. Furthermore, considering the totality of circumstances, we hold that the victim's identification of defendants at the jail did not take place under circumstances "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to be a denial of due process of law under the Fourteenth Amendment. The principles expounded in *Stovall* are therefore unavailable to these defendants. See *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345, where cases illustrating the suggestive, unfair type of lineup offensive to due process are cited and discussed.

It is difficult to imagine a set of facts and circumstances which would render the identification of an accused more definite and certain than those in this case. It is perfectly apparent that Russell's in-court identification was based on his observation of defendants while their captive rather than on the entirely harmless "confrontation" at the jail. This assignment of error is overruled.

[2-4] Defendants' remaining assignment of error relates to the charge with respect to Daylight Saving and Eastern Standard Time. When that portion of the charge is considered in context, however, we do not regard it as prejudicial. A charge will be construed contextually, and isolated portions will not be held prejudicial when the charge as a whole is correct. *State v. Cook,* 263 N.C. 730, 140 S.E. 2d 305; *State v. Goldberg,* 261 N.C. 181, 134 S.E. 2d 334; *State v. Taft,* 256 N.C. 441, 124 S.E. 2d 169. "The charge of the court must be read as a whole . . .," *State v. Wilson,* 176 N.C. 751, 97 S.E. 496; and if it presents the law fairly and clearly to the jury, the fact that some expressions, standing alone, might be considered erroneous will afford no ground for reversal. *State v. Hall,* 267 N.C. 90, 147 S.E. 2d 548. Technical errors which are not substantial and which could not have affected the result will not be held prejudicial. *State v. Norris,* 242 N.C. 47, 86 S.E. 2d 916. It is not sufficient to show that a critical examination of the judge's words, detached from the context and the incidents of the trial, are capable of an interpretation from which an expression of opinion may be inferred. *State v. Jones,* 67 N.C. 285.

Defendants were not prejudiced by the segregated portion of the charge to which they object. It had no prejudicial effect on the result of the trial and was therefore harmless. *State v. Perry,* 231 N.C. 467, 57 S.E. 2d 774. This assignment of error is overruled.

The decision of the Court of Appeals upholding judgment of the trial court is

Affirmed.