STATE OF NORTH CAROLINA v. PHILLIP MARSHALL HILL
and JAMES A. GALLOWAY

No. 68

(Filed 14 April 1971)

1. Constitutional Law § 32— waiver of right to counsel — police lineup
    Defendant's statement to police officers, after he had been
    advised of his rights, that he did not need an attorney during a police
    identification lineup constituted a valid waiver of the right to counsel.

2. Criminal Law § 66— police lineup procedures — question of sugges-
   tiveness
    The fact that the participants in a police identification lineup
    were required three or four times to change their numbers and to
    shift their positions in the line did not render the lineup suggestive
    or conducive to mistaken identification.

---

State v. Hill

---

3. **Criminal Law § 66— police lineup — failure to make immediate identification**

    The fact that the defendant was not identified in the first of two police identification lineups goes to the weight of the identification testimony rather than to its competency.

4. **Searches and Seizures § 1— warrantless search of automobile at police station — lawfulness of search**

    It was lawful for officers to make a warrantless search of defendant's automobile that had been taken to the police station following the defendant's arrest for armed robbery, where (1) the officers had probable cause to stop the defendant's car and arrest defendant, (2) a search of the car on the highway would have been impractical and perhaps dangerous, and (3) a shotgun barrel and a pistol barrel openly protruded from under the seat of the automobile.

5. **Searches and Seizures § 1— lawfulness of warrantless seizure — case where search is unnecessary**

    The constitutional guaranty against unlawful searches and seizures does not prohibit police officers from making a warrantless seizure in cases where a search is unnecessary.

6. **Searches and Seizures § 1— seizure of concealed guns in automobile**

    The warrantless seizure of pistols that were wholly concealed under an automobile seat was lawful where the pistols were discovered during the lawful removal of visible weapons from the car.

APPEAL by defendants from *Cooper, J.,* at the 19 October 1970 Criminal Session, CUMBERLAND Superior Court.

Criminal prosecution upon a bill of indictment, proper in form, charging defendants with the armed robbery of Marie Harmon on 28 May 1970.

The State's evidence tends to show that Mrs. Marie Harmon was operator of the Star Stop Grocery in Cumberland County. At 9:45 p.m. on the evening of 28 May 1970, two Negro men entered the grocery. One walked to the counter directly in front of Mrs. Harmon, stood there for two or three minutes, and "handled some bottles that had been taken out of the cooler." The other went to the back of the store where he was not immediately in view. The two men then got together and walked to the counter where Mrs. Harmon was standing. She asked if she could help them. One replied, "Yes, just open up the cash register and give me all the money." He had a small gun with a black barrel pointed at Mrs. Harmon. She opened the cash register and held out the money and some checks. The robbers took the money, threw the checks on the counter, and left by the

front door. Mrs. Harmon followed them outside, saw a man across the street pumping gas, screamed for help, and the robbers started running. She then reentered the store and called the sheriff's department. Deputy Sheriff Frye, in response to a radio call, arrived at the store within three minutes. She told this officer that the robbers were two colored males, one six feet tall and the other shorter, one wearing an orange hat with some sort of writing on it, and both of medium dark complexion. As a result of information received by Deputy Frye and relayed to the sheriff's department, an alert was put out for a blue Ford bearing Maryland License No. CM 8917.

At approximately 10:10 p.m., Officer O'Brian, who had received the radio alert, parked near Vick's Drive-In on Rowan Street in Fayetteville. He saw three Negro men (later identified as Phillip Marshall Hill, James A. Galloway and Vernon Harmon) at the drive-in standing between a 1968 Ford Torino bearing Maryland License No. CM 8917 and a red 1964 Ford Fairlane with a taillight out. In about ten minutes Galloway and Harmon entered the 1964 Fairlane and proceeded west on Rowan Street with Galloway driving. Deputy Willie Brown in Car 38 was alerted by Officer O'Brian to stop this vehicle and check out the two occupants with reference to the armed robbery. Defendant Hill entered the 1968 Ford Torino and, as he turned west on Rowan Street, was stopped by Officer O'Brian and placed under arrest for armed robbery. A big orange hat was lying between the seats. A person who was with Officer O'Brian drove the Torino to the sheriff's department where it was parked and locked. It was later searched with Hill's written permission. Nothing was found save the orange hat which was seized and offered in evidence at the trial.

Deputy Brown in Car 38 was parked on Rowan Street near Vick's Drive-In. After receiving the alert from Officer O'Brian, he saw the 1964 Fairlane leave Vick's Drive-In with James Galloway driving. He followed and stopped it at Bragg Boulevard. When Deputy Brown got out of his vehicle, he saw Galloway pass something to Vernon Harmon, the passenger on his right, who looked back and then bent forward as if to put something under the seat. Galloway was dressed in pants and a blue shirt. When he opened the glove compartment to produce his driver's license and registration card, the officer saw two boxes of Remington ammunition. When Galloway opened the

door to get out of the car, the officer saw about four inches of a shotgun barrel protruding from under the seat. Deputy Harvey Carter arrived on the scene and took Galloway to the courthouse. Deputy Brown drove the 1964 Fairlane to the courthouse with Vernon Harmon as a passenger. There, he removed Harmon from the car and delivered him to other officers. Then Deputy Brown and Officer O'Brian shined a flashlight into this vehicle and saw a pistol protruding from under the front seat on the right side. Officer Brown opened the door, reached to get the pistol they had observed and discovered that there were two more pistols under the seat. The three pistols and shotgun were taken by the officers and later offered in evidence at the trial. The pistols were loaded and the shotgun was loaded with rifle slugs.

Upon Galloway's timely objection prior to the introduction of the weapons and the Remington ammunition, a *voir dire* was conducted in the absence of the jury, during which only evidence for the State was heard—defendants offered none. At the conclusion of the *voir dire* the court found facts substantially as above set out and concluded as a matter of law that Officers Brown and O'Brian had probable cause to search the 1964 Fairlane for weapons and stolen money.

Between midnight and 1 a.m. on the same night of 28 May 1970, in response to a call from the sheriff's department, Mrs. Marie Harmon went to the courthouse to view a lineup. There, she entered a viewing room and looked at a lineup in an adjacent room through a one-way glass window. There were six or seven people in the lineup, including defendants Hill and Galloway, Vernon Harmon, one Eddie Butler and others. She immediately identified Galloway as the man wearing the orange hat when she was robbed three hours earlier. She did not identify Hill that night but returned and viewed a second lineup the following morning at 10 a.m. At that time she identified Hill as the other robber.

Upon timely objection by defendants, interposed before any testimony with respect to the lineups had been elicited, the court conducted a *voir dire* in the absence of the jury. Both the State and the defendants offered evidence on the *voir dire*. Among other things, Mrs. Harmon said that although she identified both defendants in the lineup, "my identification here today has been based on the time of the robbery. I base my

recollection of Galloway on the fact that I observed him for two or three minutes at least at one time. Also, I base the identification on his general appearance, his face, and one thing is that he is extremely thin. An extremely thin person came toward me before he went to the back. I looked at him at that time. He came within two feet of me. I base my recollection of the identification of Hill on the same things. That is, I recall his facial features and his complexion. He just looks like the person. There is no doubt in my mind these were the two men who came into my business on May 28, 1970. It was never suggested by any law enforcement officer prior to the identification of the lineups that these were the men."

Deputy Louis Frye testified for the State on *voir dire* that he first talked to defendant Hill, warned him of his rights and read a regular rights form to him; that he told Hill they were going to have a lineup; that Hill was suspected of armed robbery and entitled to have an attorney present at the lineup and during any questioning and one would be appointed for him if he couldn't afford one; that he did not have to stand in the lineup until he talked to an attorney or until he had one present, and that he offered to call Mr. Cherry, the Public Defender, for Hill, whereupon Hill stated he did not mind standing in the lineup, did not need an attorney, but did not want to sign any papers.

Deputy Frye further stated that he advised defendant Galloway of his constitutional rights, telling him the same thing he had told Hill; that both defendants stated they didn't mind standing in a lineup, that they didn't have anything to be afraid of and did not want the services of an attorney; that they did not want to sign any papers and refused to sign the regular rights form.

The defendant Hill testified on *voir dire* that the first lineup was conducted about 12:30 a.m. on the night of 28 May 1970; that there were seven people in the lineup including himself, James A. Galloway, Vernon Harmon and Eddie Butler; that after he left the lineup he didn't participate in any lineup after that night; that during the lineup the participants would be required to turn around, change numbers, shift positions, and then turn and face the window with the one-way glass; that this shifting of positions and exchange of numbers was carried out three or four times during the lineup in which

he participated; that he signed a paper that night "stating that they could search my car" and said, "you can go and search it"; that he was not advised of his constitutional rights before the lineup was conducted but was advised later when the warrant was served upon him.

James A. Galloway testified on *voir dire* that he was in the same lineup described by defendant Hill; that he heard Mrs. Harmon talking and heard her say that "No. 2 looked like the one. Then, I looked down to my number to make sure what it was and started objecting right then." This defendant further stated that he signed a rights form containing a waiver of those rights after he had read it, and he identified his signature thereon; that Lt. Washburn read the rights form to him after the warrant was served; that he did not know before the lineup that he was being charged with armed robbery; that he signed the rights form after the lineup and had not been advised of his rights before the lineup was conducted.

Vernon Harmon testified on *voir dire* that he was placed in four or five lineups and remembered seeing James Galloway and Phillip Hill in the lineups; that about seven of them were standing against the wall; that it all took place about 11:30 p.m.

Deputy Frye returned to the stand as a State's witness and again, on rebuttal, testified that Galloway and Harmon were brought into the room a few minutes after he sat down to talk to Hill; that all three were advised of their constitutional rights prior to any lineup.

Following the *voir dire* and upon conclusion of arguments, the court made findings of fact that both defendants were advised of their constitutional rights as specified in *Miranda v. Arizona* (384 U.S. 436, 16 L. Ed. 2d 694, 86 S.Ct. 1602) prior to the lineup; that each defendant stated that he did not object to participating in a lineup, did not want the services of an attorney, but did not want to sign any papers; that the lineup was thereafter conducted and Mrs. Harmon identified defendant Galloway that night as one of the robbers and, following the second lineup the next morning, identified the defendant Hill as the other robber; that Mrs. Harmon never at any time identified any other person as having participated in the robbery. Based on those findings the court concluded that the lineup

State v. Hill

procedure was not illegal, did not violate the constitutional rights of either defendant, and that defendants willingly, knowingly and understandingly participated in said lineups after having been advised of their rights and of the armed robbery charge under investigation. The court further concluded that Mrs. Harmon's in-court identification of defendants Hill and Galloway was not based upon her observation of them at the lineup but originated independently from her observation of defendants during the robbery. The judge ruled that the identification evidence to which objection had been made was admissible, and Mrs. Harmon was permitted to identify defendants in court before the jury.

Defendants offered evidence before the jury tending to establish an alibi. James A. Galloway testified that on 28 May 1970 he lived in a trailer at 604 Leisure Living Trailer Park with Vernon Harmon and Miss Cadena James, Harmon's "girl friend." The trailer park is one mile from the Star Stop Grocery. At 11 a.m. on that date he left his residence and went to Fayetteville State College where he picked up his girl friend Debora Cunningham. Returning to his residence with her, he picked up Vernon Harmon and Cadena James, and the four of them went shopping in downtown Fayetteville. They returned to his residence about 7 p.m. At 8 p.m. they went to the Laundromat and stayed there until 9:45 p.m. They then returned to his trailer at Leisure Living Trailer Park and stayed there until 11 p.m., at which time he and Vernon Harmon drove to Vick's Drive-In where he saw the defendant Hill for the first time that day. Shortly after leaving Vick's Drive-In he was arrested.

Defendant Galloway further stated that he was not at the Star Stop Grocery that day and did not rob Mrs. Harmon; that he had never worn the orange hat referred to in the State's evidence and first saw it at the hearing; that the car he was driving at the time of his arrest, and the weapons in it, belonged to Vernon Harmon; that the weapons were kept at the trailer where they lived, loaded.

Vernon Harmon testified that defendant Galloway was with him all day on 28 May 1970 as detailed in Galloway's testimony. With reference to the weapons, this witness said: "We had the pistols in the house and were going to take them to a friend's house. We were going to leave them at his house.

State v. Hill

I don't recall his name at the moment. . . . I was in my car but it was being driven by James Galloway. . . . I knew that there were three loaded pistols and a loaded shotgun in the car under the seat."

Cadena James corroborated the testimony of defendant Galloway with reference to his whereabouts on 28 May 1970.

Phillip Marshall Hill testified that he lived at Leisure Living Trailer Park on 28 May 1970 and knew James Galloway who was his friend; that between the hours of 6 p.m. and 11 p.m. on 28 May 1970 he was at the home of Bobby Adams playing poker and whist with Adams, Dwight Tyler and others; that when he left at 11 p.m. he drove to Vick's Drive-In, arriving at 11:20 p.m., and was arrested five or ten minutes later; that he was a member of the United States Army and had been paid $326 that morning; that he had never been to the Star Stop Grocery and did not rob the store; that he had not been with James Galloway and saw him for the first time that day at 11:30 p.m. at Vick's Drive-In; that the orange hat was not in his car when the officer stopped him, "but it might have been when I got to the Courthouse. . . . I was in a patrol car. One of the officers drove my car."

Bobby Adams, a staff sergeant in the United States Army, testified that defendant Hill played poker and whist at his house from 6:30 or 7 o'clock p.m. until 10:45 p.m. on 28 May 1970; that Hill and Dwight Tyler came together and Hill left at 10:45 p.m. to get food; that he next saw Hill after he was subpoenaed to appear at the preliminary hearing.

Dwight Tyler testified that he lived at the same house where defendant Hill lived; that he and Hill went to the home of Bobby Adams between 6:30 and 7:00 p.m. on 28 May 1970 to play poker; that Hill did not leave the poker party from the time he arrived until 10:45 p.m. when he left to go to Vick's Drive-In; that they were all paid at Fort Bragg on that date.

David Green testified that he went to the home of Bobby Adams about 6:30 p.m. on 28 May 1970 and borrowed his car with the understanding that he would return it before 11 p.m.; that he returned the car at 10:50 p.m. that night and defendant Hill, who was in the process of getting into his car, drove away at that time.

Deputy N. A. Monroe, a rebuttal witness for the State, testified that the orange hat (State's Exhibit 1) was on the right hand side of the front seat of Hill's car on the night of 28 May 1970; that he removed the hat and gave it to Deputy Frye who tagged it.

Deputy Frye testified that he tagged the hat given him by Deputy Monroe and that it had been in the locker in the sheriff's department since that time.

Following arguments of counsel and charge of the court, the jury returned a verdict of guilty as charged as to each defendant. Judgment was pronounced imposing a prison term of not less than twenty nor more than twenty-five years on each defendant, and defendants gave notice of appeal to the Court of Appeals. The case is before the Supreme Court for initial review under our general referral order dated 31 July 1970.

*Sol G. Cherry, Public Defender, Twelfth Judicial District, for Defendant Appellant Phillip Marshall Hill; Mitchel E. Gadsden, Attorney for Defendant Appellant James A. Galloway.*

*Robert Morgan, Attorney General; William W. Melvin and T. Buie Costen, Assistant Attorneys General, for the State.*

HUSKINS, Justice.

Was the lineup procedure employed in this case so unnecessarily suggestive and so conducive to irreparable mistaken identification as to constitute a denial of due process in violation of the Fourteenth Amendment? This is the only question posed by the appeal of Phillip Marshall Hill.

[1] The issue of waiver of counsel is not raised, although no counsel was present at the lineups in question. The court found on conflicting evidence at the *voir dire* that prior to any lineup Hill was fully advised of his constitutional rights, including the right to have counsel present, and stated, in the words of Deputy Frye, that "he didn't mind standing in the lineup and that he didn't need an attorney." This defendant thus exercised an "intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst,* 304 U.S. 458, 82 L. Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357 (1938); *Brady v. United States,* 397 U.S. 742, 25 L. Ed. 2d 747, 90 S.Ct. 1463 (1970). In such fashion, Hill waived the right to counsel as an incident of due process accord-

ed him by the Fourteenth Amendment, a right fully discussed in *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S.Ct. 1926 (1967), and *Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S.Ct. 1951 (1967).

Notwithstanding the waiver of counsel, Hill contends the lineup procedures used to identify him were "so impermissively suggestive as to give rise to a very substantial likelihood" of irreparable mistaken identification—a denial of due process of law. *Simmons v. United States,* 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S.Ct. 967 (1968); *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S.Ct. 1967 (1967); *Foster v. California,* 394 U.S. 440, 22 L. Ed. 2d 402, 89 S.Ct. 1127 (1969); *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345 (1969); *State v. Gatling,* 275 N.C. 625, 170 S.E. 2d 593 (1969); *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581 (1968). This requires an examination of the totality of circumstances surrounding the questioned lineups.

The evidence on *voir dire* conflicts as to exactly how many lineups were conducted, and the trial judge refused to find as a fact that any certain number were held. The conflict emerging from the testimony, however, seems more a battle of semantics than the result of faulty memory. It is undisputed that Hill and Galloway stood in a lineup with six or seven other men at approximately 1:00 a.m. in the early morning of May 29. With respect to this lineup, Hill himself testified that the participants would be required to turn around, change numbers, shift positions in the line, and then turn to face the one-way glass window through which the lineup was being observed. Some of the witnesses described each shift and change as an additional lineup, while others treated it as one lineup throughout the proceeding. This accounts in large measure for the conflicting testimony with respect to the number of lineups conducted and, in our view, has no legal significance. After viewing the two defendants in a lineup conducted as described, Mrs. Harmon identified James A. Galloway as one of the men who robbed her approximately three hours earlier that night.

At 10:30 a.m. on May 29, about ten hours later, the second phase of the lineup procedure took place. This phase roughly paralleled the procedure of the first phase. The men were placed in line, viewed by Mrs. Harmon through the one-way window, then asked to change numbers and positions and again face

the viewing window. Deputy Frye testified: "We always have three or four lineups and switch the person around in places beside different people and in different locations." Following this phase, defendant Hill was identified by Mrs. Harmon as one of the robbers.

[2] It appears that the number of lineups conducted depends upon the notion of the various witnesses as to what constitutes a lineup. Nevertheless, the number is unimportant. The significant inquiry is whether the procedure used was suggestive and conducive to mistaken identification. We hold that it was not. The circumstances revealed by this record do not even approach in suggestiveness the procedure employed by police in *Stovall* (bedside identification of a single suspect); or in *Foster* (defendant, six feet tall, required to stand in two successive lineups with two short men while wearing a jacket similar to that worn by the robber); or in *Simmons* (suggestive use of photographs). Indeed, the procedure used here seems calculated to make identification more difficult and to insure the correctness of the identification eventually made. The shifting of the men in line accompanied by an exchange of the number held by each certainly did not make the identification any easier. Furthermore, there is no evidence of any suggestions by the police prior to the lineup or of any effort by the officers to direct the attention of Mrs. Harmon to any particular participant. No apparent physical disparities between the participants rendering the defendants especially obvious appear in the record; and the number of participants in the lineup was sufficient to negate any suggestion that defendants were the robbers merely because of their presence. See *State v. Rogers, supra,* for cases from other jurisdictions which illustrate the suggestive, unfair type of lineup referred to in *Wade, Gilbert* and *Stovall* and condemned by the United States Supreme Court in *Foster v. California, supra.*

[3] The fact that Hill was not identified in the first lineup does not indicate suggestiveness. The purpose of the *Wade, Gilbert* and *Stovall* line of cases is to curtail suggestive lineup *procedures.* If the procedure is fair to the defendant, the fact that the identification itself is not immediate goes to the weight rather than the competency of the testimony and is thus a matter to be considered by the jury. *Lewis v. United States,* 417 F. 2d 755 (1969), *cert. den.,* 397 U.S. 1058, 25 L. Ed. 2d 676, 90 S.Ct. 1404; *Parker v. United States,* 404 F. 2d 1193 (1968).

It is worthy of note that Mrs. Harmon viewed the first line-up within three hours and the second lineup within approximately twelve hours of the robbery. Events were fresh in her mind. She never at any time identified any other person as having robbed her. Her store was well lighted and she had observed the robbers closely when the crime was committed. She described their clothing, their facial features and complexion, and testified both on the *voir dire* and before the jury: "There is no doubt in my mind that the defendants James A. Galloway and Phillip Hill are the ones who came into my store on the evening of May 28, 1970 and robbed me." She further stated that her identification at the trial was based on her recollections at the time of the robbery. The trial judge so found at the conclusion of the *voir dire*. Thus, had the lineup been illegal, as suggested but not shown, there is ample evidence that the in-court identification was of independent origin and therefore competent. *State v. Wright, supra* (274 N.C. 84, 161 S.E. 2d 581). This assignment of error is overruled.

[4] Defendant Galloway contends that the weapons found in a warrantless search of the 1964 Fairlane at the police station after his arrest were the fruits of an illegal search and inadmissible under *Mapp v. Ohio,* 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S.Ct. 1684 (1961). He assigns as error the admission of the shotgun and three pistols taken by the officers from the car he was operating. This constitutes Galloway's only assignment of error.

The assignment ignores recent authority to the contrary. In *Chambers v. Maroney,* 399 U.S. 42, 26 L.Ed. 2d 419, 90 S.Ct. 1975 (1970), the United States Supreme Court dealt with a fact situation on all fours with the facts in this case. There, acting on information concerning the clothing worn and the car driven by the robbers, police stopped a car fitting the description given and arrested its occupants for the robbery. Later, after the car had been taken to the police station, it was searched without a search warrant and the incriminating evidence was seized. The Supreme Court held that the Fourth Amendment rights of the accused were not violated by the warrantless search for that there was probable cause to search the vehicle on the spot at the time of the arrest, and such probable cause still obtained at the station house. The rationale of the decision, which arguably marks a digression from the

formerly prevailing view of the Fourth Amendment (see separate opinion of Mr. Justice Harlan), is that there is "a constitutional difference between houses and cars" by reason of the mobility of the latter. The Court explained that even when the car was sitting at the station house, it was highly mobile and its contents in danger of removal "unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured."

We think it clear that *Chambers* controls the instant case. Here, the police, acting on reliable information, had probable cause to stop the 1964 Fairlane driven by Galloway and arrest him. As in *Chambers*, a careful search of the car was reasonable but impractical and perhaps dangerous at the time and place of the arrest. The station house search a short time later was fully justified and constituted a lawful search. *State v. Jordan*, 277 N.C. 341, 177 S.E. 2d 289 (1970) ; *State v. McCloud*, 276 N.C. 518, 173 S.E. 2d 753 (1970).

[5, 6]   Furthermore, when the circumstances require no search, the constitutional immunity from unlawful searches and seizures never arises. "Where no search is required, the constitutional guaranty is not applicable. The guaranty applies only in those instances where the seizure is assisted by a necessary search. It does not prohibit a seizure without warrant where there is no need for a search, and where the contraband subject matter is fully disclosed and open to the eye and hand." 47 Am. Jur., Searches and Seizures, § 20; *State v. Colson*, 274 N.C. 295, 163 S.E. 2d 376 (1968). Here, the shotgun barrel and one pistol barrel protruded from under the car seat, and the presence of those two weapons was fully disclosed. When two additional pistols were discovered while the officers were in the act of removing the visible weapons, their subsequent seizure was a mere continuation of a lawful seizure of the visible weapons and in nowise constituted an unlawful search prohibited by the Fourth Amendment. *State v. Dobbins*, 277 N.C. 484, 178 S.E. 2d 449 (1971) ; *State v. McCloud, supra*. This assignment of error is overruled.

In the trial below, we find

No error.