STATE OF NORTH CAROLINA v. MICHAEL BASS AND GREGORY ALEXANDER BARRETT

No. 78

(Filed 9 February 1972)

**1. Constitutional Law § 32— capital case — waiver of counsel by indigent**

At all times pertinent to this rape case, an indigent defendant in a capital case could not waive the right to counsel either orally or in writing. [Former] G.S. 7A-457.

**2. Constitutional Law § 32— right to counsel at lineup**

A pretrial in-custody lineup for identification purposes is a critical stage in the proceedings, and by statute in this State an accused so exposed is entitled to the presence of counsel. G.S. 7A-451(b)(2).

**3. Criminal Law § 66— illegal pretrial lineup — in-court identification — independent origin**

Rape victim's in-court identification of defendant was not tainted by an illegal lineup and was properly admitted, where the trial court found upon competent supporting evidence that the victim's in-court identification was based on her observation of defendant during the assault and originated independently of the lineup.

**4. Criminal Law § 66— evidence of illegal lineup identification — harmless error**

Although the trial court erred in the admission of evidence of the identification of defendant in a February 1971 lineup at which defendant was not represented by counsel, such error was harmless beyond a reasonable doubt in light of the State's strong evidence of defendant's guilt and the fact that the victim's identification of defendant was not based on the lineup identification but was independent in origin.

435

**5. Criminal Law § 66— admissibility of identification testimony — written findings filed after evidence admitted**

Defendants were not prejudiced if, as defendants contend, the trial court's findings and conclusions as to the admissibility of identification testimony were reduced to writing and filed after the testimony had been admitted before the jury where the findings were supported by competent evidence on voir dire and the testimony was competent, although it is the better practice to make such findings at the time the evidence is tendered and before it is admitted.

**6. Criminal Law § 21— preliminary hearing — function of district court judge**

In his capacity as examining (or committing) magistrate in a felony case, the district judge is concerned only with determining (1) whether a felonious offense has been committed and (2) whether there is probable cause to charge the prisoner therewith. G.S. 15-94; G.S. 15-95.

**7. Criminal Law § 21— preliminary hearing — failure to reduce testimony to writing**

The requirement of G.S. 15-88 that an examining magistrate reduce to writing "the evidence given by the several witnesses examined" is directory only and not mandatory, and defendants were not prejudiced by failure of the district judge who conducted the preliminary hearing to reduce to writing the testimony before him.

**8. Criminal Law § 86— credibility of defendant — impeachment on voir dire**

In this rape prosecution, the solicitor was properly permitted to examine defendant on voir dire respecting the admitted fact that he was then on parole from a sentence previously imposed for assault with intent to commit rape, since defendant's credibility as a witness was subject to impeachment before the judge in the same manner as it would have been had he taken the stand and testified before the jury.

**9. Criminal Law §§ 66, 87— in-court identification — leading questions on voir dire**

The trial court did not abuse its discretion in permitting the solicitor to ask a rape victim leading questions on voir dire as to whether her identification of defendant was based on a pretrial lineup.

**10. Criminal Law § 42; Rape § 10— testimony that jacket was "similar" to one worn by assailant**

The trial court did not err in allowing a rape victim to testify that a green military-type jacket admitted in evidence was "similar" to the coat worn by defendant when he raped her.

**11. Rape § 10— clothing worn by defendant when arrested**

A blue sweat shirt and a red T-shirt defendant was wearing when arrested were properly admitted in a rape case, the prosecutrix having testified that defendant was wearing a red T-shirt when he raped her, and there being evidence that hairs on the blue sweat shirt matched in microscopic detail hairs taken from the prosecutrix.

State v. Bass

12. **Criminal Law § 39— evidence to rebut codefendant's alibi — admission against defendant — harmless error**

　　In a rape prosecution, the admission of testimony of a State's witness offered to rebut a codefendant's alibi evidence, if erroneous as to defendant, did not prejudice defendant since the exclusion of such evidence as to him would not have affected the result of his trial.

13. **Criminal Law § 92— consolidation of rape charges against two defendants**

　　The trial court did not err in consolidating for trial indictments charging two defendants with identical crimes of rape.

14. **Indictment and Warrant § 14— grounds for quashing indictment**

　　A bill of indictment may be quashed for want of jurisdiction, for irregularity in the selection of the grand or petit jury, or for defect in the bill of indictment.

15. **Indictment and Warrant § 14— motion to quash**

　　A motion to quash lies only for a defect appearing on the face of the warrant or indictment.

16. **Indictment and Warrant § 14— motion to quash**

　　A motion to quash does not lie unless it appears from an inspection of the warrant or indictment that no crime is charged or that the warrant or indictment is otherwise so defective that it will not support a judgment.

17. **Indictment and Warrant § 14— motion to quash — consideration of extraneous evidence**

　　In ruling on a motion to quash, the court is not permitted to consider extraneous evidence; therefore, when the defect must be established by evidence aliunde the record, the motion must be denied.

18. **Indictment and Warrant § 14— motion to quash — alleged arrest without probable cause — recitals in motion and affidavit by counsel — court's failure to consider**

　　In ruling on defendant's motion to quash a rape indictment on the ground that defendant was arrested without probable cause, the trial court properly ignored defendant's recitals in the motion, based on information and belief, that the victim failed to identify photographs of him and that the police refused to place him in a lineup, and an affidavit of defendant's counsel that he had demanded a lineup for defendant and that the prosecutrix stated on oath at the preliminary hearing that she was not certain of her identity of defendant, since evidence foreign to the record may not be used to establish a defect in the indictment.

19. **Criminal Law § 66— identification at preliminary hearing — impermissble suggestiveness**

　　The preliminary hearing was not impermissibly suggestive so as to render incompetent the testimony of a rape victim that she identified defendant at the preliminary hearing as one of her assail-

ants, where there was no evidence of impermissible suggestiveness by the officers or the court, and the victim testified that she recognized defendant without prompting as soon as she entered the courtroom.

**20. Criminal Law § 66— evidence of identification at preliminary hearing**

The fact that a rape victim failed to identify defendant from photographs and the fact that there were discrepancies and contradictions in her testimony at the preliminary hearing goes to the weight of rather than the competency of her testimony that she identified defendant at the preliminary hearing as one of her assailants.

**21. Criminal Law §§ 99, 170— remarks of trial court — harmless error**

In this rape prosecution, the following remarks of the trial court to defense counsel, while improper, did not constitute prejudicial error when considered in context and in the setting in which they occurred: (1) "It [question by defense counsel] must not have been important then. If you don't care to restate it, we won't move into it."; (2) "Just a minute that wasn't what she said at all. You know there are not six Saturdays in February. And you know this witness knows there are not six Saturdays in February."; (3) "You are not to lecture this witness. I mean what I say. Now, you cross-examine him."

Justice LAKE concurring in result.

DEFENDANTS appeal from *Johnston, J.,* 24 May 1971 Session, GUILFORD Superior Court. This case was docketed as No. 138 and argued at the Fall Term 1971.

Defendants were tried upon separate bills of indictment, proper in form, charging them with the rape of Sandra K. Garner on 6 February 1971. Defendant Barrett's motion for a separate trial was denied, and defendants were tried together over Barrett's objection. Bass was adjudged indigent and was represented by the public defender. Barrett was represented by privately employed counsel.

The State's evidence tends to show that Sandra Garner, a sixteen-year-old high school girl, went to the Buckaroo Steak House on 6 February 1971 at 9:30 p.m. to pick up Cathy Edgerly, a girl friend who worked there. Sandra was driving a black and white 1963 Plymouth Fury four-door sedan. She parked it in front of the Steak House in a well-lighted area near the door. She observed two young colored men standing nearby. She had never seen them before but now knows them as Michael Bass and Gregory Alexander Barrett. She entered the Steak House to let Cathy know she was there and waiting for her. When she returned and entered her car, defendant Bass opened the right front passenger door, grabbed her hair, pulled her head down to the seat and struck her on the head. Defendant Bar-

rett entered her car by the left front door and pulled a gun. Bass took her car keys from her pocketbook, and Barrett drove the car away while Bass held her head down on the seat. She screamed and struggled to no avail. As they traveled along Summit Avenue in Greensboro, she could see their faces under the street lights and recognized them as the same two young colored men she had seen before entering the Steak House.

One defendant asked Sandra her name and where she went to school. "I gave him a fake name, and they got my driver's license out of my pocketbook and read my name and address and said they knew who I was and where I lived, and if they read anything about it in the paper or anything happened to either one of them, they knew who I was and where I lived and wouldn't be afraid to come after me and kill me."

The driver, Barrett, turned left off Summit Avenue onto a dirt road. Sandra was then pushed headfirst over the front seat into the rear seat and landed with her face against "the back of the back seat." Bass followed her into the back seat, forcibly removed her boots, her panties and panty hose, and had intercourse with her by force and against her will. Barrett stopped the car, opened the door and got into the back seat. The dome light came on and Sandra again saw their faces and recognized them as the two young men she had seen earlier before she entered the steak house. Bass stood outside the car by the right rear door, and Barrett had intercourse with Sandra by force and against her will. Then Bass reentered the car and raped the girl a second time. Then Barrett raped her a second time. While this was taking place Bass got under the wheel and started driving.

The rear window of the car had fogged over and "Bass told Barrett to get up and clear the back window so he could see if there was a police car behind us. . . . Barrett raised up and cleared the back window with his hands so he could see if it was a police car behind us. Then he said 'It might be a police car. It doesn't have any lights. Turn down this road, and if it follows us, we know it is.' " When the car continued to follow them as they turned into various side streets, Bass said: "Get ready because we are going to have to jump." Both men then jumped from the car while it was still moving and ran away. Bass was dressed in a green army jacket, a red T-shirt and was wearing boots. Barrett had on a beige jacket. Sandra could remember nothing else about their dress.

Peyton Murray, with his wife and daughter, had supper at the Buckaroo Steak House on 6 February 1971. They finished eating about 9:30 p.m. and went to their car. They saw two colored boys "back up a little bit" when they came out. These young men were fifteen to twenty feet away. The Murrays sat in their vehicle about five minutes and watched the two subjects peeping in the windows and staying in the dark behind some columns. About 9:40 p.m. a girl came out and entered her car and the two boys rushed her, one on each side of her car. "The light skinned boy had that girl's head pounding her down on the seat. I jumped out and hollered and cursed them. And they just backed out like this and went up Summit Avenue." They were in a Plymouth with a white top and a dark bottom, license number BD-7521. Mr. Murray went into the Steak House and told Cathy Edgerly to call the girl's father, as a result of which the police were also alerted. One of the assailants was wearing an army jacket with bright buttons, similar to State's Exhibit 4, the jacket Bass was wearing when arrested, but the Murrays were unable to identify defendants as the men they saw at the Steak House that night.

In response to a radio call about 10 p.m., Officer Simpson drove to the Buckaroo Steak House area looking for the black and white Plymouth bearing license number BD-7521. He saw the car at approximately 10:40 p.m. in a line of traffic at a stop light at Market and Laurel Streets. He followed the car and saw a Negro male wipe off the back glass. The car then made various right and left turns along unpaved streets and alleys and was momentarily out of view when it rounded blind corners. When the officer finally jumped from his car and ran to the slowly moving Plymouth near a dead-end alley, Sandra Garner was its only occupant. She was crying and, except for a white sweater shirt, naked and said she had been raped. She told the officer her assailants ran south toward the railroad tracks. Officer Downs and Officer Hightower were patrolling in separate cars in the area, and each was alerted by radio about 10:40 p.m. Officer Downs left his car and went to the railroad tracks where he saw two colored males running across the tracks. He pursued them through a wooded area and into a clearing back of a churchyard. Officer Hightower approached the railroad tracks in the opposite direction from Officer Downs and saw two Negro males running toward him. He saw them run into the woods and then across a parking lot behind the

church. One disappeared in a patch of woods and the other ran toward Nocho Street where defendant Bass lived with his mother. Officer Downs searched the area and found defendant Bass hiding in a Dempster Dumpster under the garbage and trash with only his eyes showing. "I told the man to get up. He stood up and made the statement that I had nothing on him and no one could identify him. . . . As he was getting out of the dumpster, I observed his belt was undone and his fly was partially unzipped." He had on a green army-type jacket and was wearing a blue sweat shirt with a red T-shirt underneath and military-type boots.

The officers knew that Michael Bass and Gregory Barrett were friends and ran together. When Bass was taken into custody an alert was put out for Barrett. Officer McNair learned from Ronald Bass, a brother of Michael Bass, that these defendants were together on the night in question and left the house together between 8 and 9 p.m. Gregory Barrett was duly arrested at 2:30 a.m. on February 8 in a room at the O'Henry Hotel where he lived. State's Exhibit 5, a light beige jacket-type coat, was hanging on the closet door.

Following his arrest, defendant Bass was warned of his constitutional rights as required by *Miranda v. Arizona,* 384 U.S. 436, and, with full knowledge and understanding of his right to counsel, orally waived such right and agreed to participate in a lineup without a lawyer present, saying he would call his lawyer in the morning. Accordingly, around 3:30 a.m. on the morning of 7 February 1971, Sandra Garner viewed a lineup of seven Negro males including Bass and identified him as one of her assailants. Defendant Barrett was never placed in a lineup following his arrest. Sandra next saw him at the preliminary hearing. She testified: "I recognized him as soon as I came into the room. He was sitting over on one side of the room against the wall. Nobody prompted me or pointed him out in any way."

Sandra Garner positively identified both defendants at the preliminary hearing and in court at the trial. She testified that she based her in-court identification "on the times I saw them the night it took place; outside the Buckaroo, and when I came out of the Buckaroo I saw them; in the car, and just the times I saw them that night."

Defendants duly objected to all in-court identification testimony, and a voir dire hearing was conducted prior to its admission. The State and both defendants offered evidence on the voir dire following which the trial judge found as a fact: (1) That Bass was duly warned of his constitutional rights; (2) that Bass freely and voluntarily, knowingly and understandingly waived his right to counsel orally before going into the lineup and thereafter freely participated in it; (3) that the lineup consisted of seven Negro males, including Bass, and that at least two other participants were wearing army-type jackets or coats, green in color; (4) that Sandra Garner identified one of her assailants as the fourth man from the left in the lineup, and Bass was standing fourth from the left; (5) that no one prompted Sandra Garner or suggested to her in any way who Bass was or where he was standing in the lineup; (6) that Sandra had seen defendants Bass and Barrett about 9:30 p.m. on 6 February 1971 when she first went to the Buckaroo Steak House, and saw them again when she left her car and entered the Steak House, and saw them again when she left the Steak House and returned to her car, and saw their faces from time to time when they drove under street lights and when the dome light came on in the car; (7) that Sandra Garner's in-court identification of both defendants originated independently of the lineup; (8) that the pre-trial out-of-court identification procedures in which Bass participated were not so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification; (9) that Sandra recognized defendant Barrett at the preliminary hearing on 12 February 1971 as soon as she entered the courtroom and saw him seated in a group with other persons, including several Negro males, and there was no suggestiveness on the part of the officers or anyone else as to who Barrett was or where he was seated; (10) that her identification of Barrett was based on her observation of him as she entered and left the Buckaroo Steak House, and at the time he forced his way into her car, and upon seeing him before and during the attack on her; (11) that her in-court identification of Barrett "was independent of and untainted by outside influences and is based solely on her seeing Barrett before and during his attack on her and is of independent origin and not from any pre-trial confrontation"; and (12) that her identification of Barrett at the preliminary hearing was not impermissibly suggestive so as to give rise to a substantial likelihood of irreparable misidentification on her part. The court

thereupon concluded that her in-court identification of both defendants was competent. Defendants' motions to suppress were thereupon denied, and the in-court identification of each defendant by Sandra Garner was admitted over objection.

Michael Bass did not testify and offered no evidence.

Gregory Barrett testified in his own behalf. His evidence tends to show that he attended a movie with his girl friend Brenda Brown on Saturday night, the 6th day of February 1971, arriving at the theater about 7:30 p.m. and leaving the theater about 9:30 p.m.; that he then sent his girl friend home on a bus and went to Michael Bass' house, arriving there "about a quarter of ten to ten thirty"; that Bass was not at home and he watched television until about 11 p.m. at the Bass residence; that he then called Brenda Brown and they rode a cab to the O'Henry Hotel, where they had been living together for about four months, and went to bed. Barrett stated that he did not see Michael Bass at all on 6 February 1971.

Brenda Brown corroborated Barrett's testimony. She testified they arrived at the theater at 7:30 p.m. on 6 February 1971, saw the movie completely through, and left at 9:30 p.m.; that she then rode a bus to her grandmother's home and Barrett left, saying he was going to Michael Bass' house; that Barrett telephoned her about 11 p.m. as a result of which she caught a cab, went to the Bass home, and she and Barrett watched Shock Theater on television until midnight or later and then rode a cab to the O'Henry Hotel where they retired for the night; that Michael Bass never came home during the time she was there. She admitted on cross-examination that she gave a statement (S-10) to the police, written in her own handwriting and signed by her, that she and Barrett went to the theater at 5:30 p.m., got out about 7:30 p.m., and she caught a bus to Paulette Knox's house. She asserted, however, that she had the time mixed up and the written statement was not true.

Defendant Barrett offered other witnesses whose testimony tends, in some measure, to support his alibi.

The State offered rebuttal evidence which tended to show, among other things, that Brenda Brown gave the police a statement in her own handwriting that she and Gregory Barrett went to the Carolina Theater at 5:30 p.m. on 6 February 1971 and left about 7:30 p.m.; that she went to Paulette Knox's

house and Gregory Barrett said he was going down to Michael Bass' house; and that upon receiving a phone call from Barrett around 11 p.m. she went to Michael Bass' house. As a State's rebuttal witness, Paulette Knox testified that she went to Brenda Brown's home before noon on 6 February 1971 and took Brenda to her house and they stayed there together all that day; that "[a]fter dark, we left my house and went to the Paradise Drive-In. I don't know what time it was, but the two of us were together, and we got back between the hours of 11:00 or 11:30." Paulette Knox further testified that Brenda Brown had called her on numerous occasions, including the day of the trial, and urged her to change her testimony. "She told me to tell the court it was on a Friday, but it wasn't. It was on a Saturday."

The jury convicted both defendants of rape and recommended life imprisonment. Judgment was pronounced accordingly and defendants appealed, assigning errors noted in the opinion.

*Wallace C. Harrelson, Public Defender, and J. Dale Shepard, Assistant Public Defender, Attorneys for Defendant Appellant Bass.*

*Alston, Pell, Pell & Weston, by E. L. Alston, Jr., Attorneys for Defendant Appellant Barrett.*

*Robert Morgan, Attorney General, and Millard R. Rich, Jr., Assistant Attorney General, for the State of North Carolina.*

HUSKINS, Justice:

The first assignment of defendant Bass is based on the contention that since he did not sign a written waiver of his right to counsel at the lineup when he was exhibited to the prosecuting witness for identification, the lineup was illegal and his subsequent in-court identification by Sandra Garner was tainted and inadmissible. He therefore argues that his motion to suppress her in-court identification should have been allowed.

[1] At all times pertinent to this case, an indigent defendant in a capital case could not waive the right to counsel either orally or in writing. See 1969 Session Laws, Chapter 1013, Section 1, codified as G.S. 7A-457; *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561 (1971).

[2] A pretrial in-custody lineup for identification purposes is a critical stage in the proceedings, and by statute in this State

an accused so exposed is entitled to the presence of counsel. G.S. 7A-451(b)(2). Defendant Bass, an indigent charged with a capital offense, thus had the constitutional right to the presence of counsel at the lineup, and the in-court identification of the accused by a lineup witness was incompetent unless the trial court first determined on voir dire that the in-court identification had an independent origin and was not tainted by the illegal lineup. *United States v. Wade,* 388 U.S. 218, 18 L.Ed. 2d 1149, 87 S.Ct. 1926 (1967); *Gilbert v. California,* 388 U.S. 263, 18 L.Ed. 2d 1178, 87 S.Ct. 1951 (1967); *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581 (1968); *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345 (1969); *State v. Austin,* 276 N.C. 391, 172 S.E. 2d 507 (1970).

[3] Here, the court conducted a voir dire examination in the absence of the jury following which it found as a fact, upon supporting evidence, that Sandra Garner's in-court identification of Bass and Barrett was based on her observation of them during the assault upon her and originated independently of the lineup. These findings of fact by the trial judge are conclusive when, as here, they are supported by competent evidence. *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966); *State v. Blackwell,* 276 N.C. 714, 174 S.E. 2d 534 (1970); *State v. Harris,* 279 N.C. 307, 182 S.E. 2d 364 (1971). In light of these principles, it follows that the victim's in-court identification of Bass was not tainted by the lineup and was properly admitted.

[4] Even so, due to absence of counsel at the lineup, the court erred in admitting evidence of the *lineup identification;* and if there is a reasonable possibility that this erroneously admitted evidence might have contributed to the conviction of Bass, a new trial is required. If not, it was harmless error. *Fahy v. Connecticut,* 375 U.S. 85, 11 L.Ed. 2d 171, 84 S.Ct. 229 (1963). "One who, because of the statute, is precluded in a capital case from waiving the right to counsel during an in-custody, pretrial lineup stands in the same position as an accused who did not knowingly, understandingly and voluntarily waive the right to counsel before the enactment of Chapter 7A, Article 36 of the General Statutes." *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227 (1971). Therefore the determinative question, simply stated, is whether the erroneously admitted evidence of the lineup identification of Bass contributed to his conviction or was harmless beyond a reasonable doubt. This requires a brief review of the evidence.

Here, Sandra Garner was with defendants for at least forty-five minutes. She observed them in a well-lighted area before and at the time they entered her car. She observed them while riding along a well-lighted street. She observed them when the car door was opened and the dome light came on. She talked with them from time to time during her abduction. Two Negro males were seen running from the point where she was found toward the point where Bass was arrested, a distance of only two and one-half blocks. When arrested, Bass was hiding in a Dempster Dumpster with his belt undone and his fly partially unzipped. When apprehended, Bass exclaimed to the officer that he "had nothing on him and no one could identify him." Bass was wearing a green army-type jacket, a blue sweat shirt over a red T-shirt, and army-type boots—clothing similar to the victim's description of one of her assailants. Hairs found on the blue sweat shirt Bass was wearing and hairs taken from the prosecutrix were "microscopically alike in all identifiable characteristics." On this record there is little chance that another trial with the lineup evidence excluded would produce a different result more favorable to defendant Bass. "To warrant a new trial it should be made to appear by defendant that the admission of the evidence complained of was material and prejudicial to defendant's rights and that a different result would have likely ensued if the evidence had been excluded." *State v. Temple,* 269 N.C. 57, 152 S.E. 2d 206 (1967) ; *State v. Williams,* 275 N.C. 77, 165 S.E. 2d 481 (1969).

In light of all the evidence, fortified by the fact that Sandra Garner's identification of Bass was not based upon the lineup identification but was independent in origin, we conclude that there was no reasonable possibility that evidence of the lineup identification of Bass contributed to his conviction. Its admission was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967) ; *Harrington v. California,* 395 U.S. 250, 23 L.Ed. 2d 284, 89 S.Ct. 1726 (1969) ; *State v. Brinson,* 277 N.C. 286, 177 S.E. 2d 398 (1970) ; *State v. Swaney,* 277 N.C. 602, 178 S.E. 2d 399 (1971). The first assignment of defendant Bass is overruled.

[5] Both defendants contend it was also error for the trial judge to file his findings of fact upon the voir dire examination after the evidence had already been admitted before the jury.

State v. Bass

Defendants argue that the voir dire was conducted on May 24 and 25 and the judge's findings of fact were filed on June 3 at 2:30 p.m. after all testimony before the jury had been taken. We fail to see how defendants have been prejudiced. The findings of fact are dated May 25 and were filed on June 3. The judgments pronounced bear date of June 5, 1971. Obviously the findings were made and filed during the trial. The record does not show with any degree of clarity the sequence of events following the voir dire. If it be conceded *arguendo* that the court's findings and conclusions were reduced to writing after the evidence was admitted before the jury, defendants were not prejudiced. The findings were supported by competent evidence offered on the voir dire, and the evidence was competent before the jury. As stated in *State v. Doss*, 279 N.C. 413, 183 S.E. 2d 671 (1971), "it is better practice for the court to make such findings at some stage during thre trial, preferably at the time the [evidence] is tendered and before it is admitted." This assignment is not sustained.

Defendants' next assignment is grounded on the failure of the district judge who conducted the preliminary hearing to reduce to writing the testimony of the witnesses examined before him. Both defendants contend they were prejudiced on the trial in the superior court by reason of such failure.

[6, 7] G.S. 7A-272(b) confers jurisdiction on the district court "to conduct preliminary examinations and to bind the accused over for trial . . . upon a finding of probable cause, making appropriate orders as to bail or commitment." When performing such duties the district judge sits only as an examining magistrate in all felony cases, *State v. Wall*, 271 N.C. 675, 157 S.E. 2d 363 (1967), because the trial of felonies is beyond the jurisdiction of the district court. In his capacity as examining (or committing) magistrate, the district judge is concerned only with determining (1) whether a felonious offense has been committed and (2) whether there is probable cause to charge the prisoner therewith. G.S. 15-94; G.S. 15-95. Although G.S. 15-88 requires an examining magistrate to reduce to writing "[t]he evidence given by the several witnesses examined," this requirement is directory only and not mandatory. It was so held in *State v. Irwin*, 2 N.C. 112 (1794) and reaffirmed in *State v. Parish*, 44 N.C. 239 (1852). Further discussion of the point raised would serve no useful purpose. This assignment is overruled.

[8]  The solicitor was permitted over objection to cross-examine defendant Bass on the voir dire respecting the *admitted* fact that he was then on parole from a sentence previously imposed for assault with intent to commit rape. He argues the judge was prejudiced by such evidence and assigns as error its admission on voir dire. The assignment has no merit and requires little discussion. Bass took the witness stand during the voir dire, and his credibility was subject to impeachment before the judge in the same manner as it would have been had he taken the stand and testified before the jury.

[9]  During the voir dire examination of Sandra Garner, the solicitor was permitted to ask, and the witness to answer, over objection, as follows:

> "Q. Is your identification here of Bass in any way based on that lineup?
>
> "A. I recognized him from the times I saw him before the lineup.
>
> "Q. In the absence of attendance at the lineup, would you still be able to recognize him here today?
>
> "A. Yes, sir. I would still be able to recognize him."

Defendant Bass assigns the court's ruling as error.

The trial court has discretionary authority to permit leading questions in proper instances, *State v. Painter,* 265 N.C. 277, 144 S.E. 2d 6 (1965), and upon defendant's failure to show prejudice such discretionary action of the trial court will not be disturbed. *State v. Cranfield,* 238 N.C. 110, 76 S.E. 2d 353 (1953). "The allowance of leading questions is a matter entirely within the discretion of the trial judge, and his rulings will not be reviewed on appeal, at least in the absence of abuse of discretion." Stansbury, N. C. Evidence (2d ed.) Witnesses § 31; *State v. Pearson,* 258 N.C. 188, 128 S.E. 2d 251 (1962). No abuse of judicial discretion is shown. This assignment is overruled.

[10]  When Bass was arrested he was wearing a green military-type jacket. It was offered in evidence as State's Exhibit 4. This jacket was exhibited to Sandra Garner while she was on the witness stand and she was permitted to testify, over objection, that it was "similar" to the coat worn by Bass on the night he raped her. Bass assigns the admission of this testimony as error.

The assignment merits no discussion and is overruled. *State v. Macklin,* 210 N.C. 496, 187 S.E. 785 (1936). "Any evidence which is relevant to the trial of a criminal action is admissible." *State v. Winford,* 279 N.C. 58, 181 S.E. 2d 423 (1971). The relevancy of "similarity" between State's Exhibit 4 and the jacket worn by the man who raped the witness should be apparent to all.

[11] Likewise, the blue sweat shirt (S-7) and the red T-shirt (S-8) Bass was wearing when arrested were properly allowed in evidence. The prosecutrix testified that Bass was wearing a red T-shirt when he raped her, and hairs on the blue sweat shirt matched, in microscopic detail, hairs taken from the prosecutrix. In this setting, the relevancy of these exhibits on the question of identity is so readily apparent that the assignments of error based thereon seem trivial. "There was no violation of the defendant's right in requiring him, while in custody under a valid arrest upon the charge in this case, to change his clothing and in taking from him the clothing which he wore at the time of his arrest immediately after the alleged offense. There was no error in permitting the State to introduce in evidence the shirt so taken from the defendant and the hair found thereon." *State v. Tippett,* 270 N.C. 588, 155 S.E. 2d 269 (1967).

[12] Defendant Bass objected to the testimony of Paulette Knox, offered by the State to rebut the testimony of Defendant Barrett and his girl friend Brenda Brown. Paulette Knox testified, among other things, that Brenda Brown had been with her "from before noon on 6 February 1971 until some time after eleven o'clock that evening" when Brenda made a phone call and left, saying she was going "over to Michael's house." Bass contends this evidence, as to him, was incompetent and its admission prejudicial.

We perceive no prejudice to Bass by the admission of this evidence. If the evidence had been excluded as to Bass, it would not have changed the result of his trial. "It is not enough for the appellant to show error, and no more. He must make it appear that it was prejudicial to his rights, and that a different result but for the error would have likely ensued." *State v. Woolard,* 260 N.C. 133, 132 S.E. 2d 364 (1963); *State v. Williams, supra; State v. Sanders,* 276 N.C. 598, 174 S.E. 2d 487 (1970). The error, if such it be, was entirely harmless. Stansbury, N. C. Evidence (2d Ed.) § 9. *State v. Franklin,* 248

N.C. 695, 104 S.E. 2d 837 (1958), relied on by defendant Bass, is factually distinguishable and provides no authority for defendant's position. This assignment is not sustained.

[13] Defendant Barrett moved for a separate trial and assigns as error the denial of his motion.

There is no merit in this assignment. These defendants were charged in separate bills of indictment with identical crimes. The offenses charged are of the same class, relate to the same crime, and are so connected in time and place that most of the evidence at the trial upon one of the indictments would be competent and admissible at the trial on the other. Under such circumstances the trial judge was authorized by G.S. 15-152, in his discretion, to order their consolidation for trial. *State v. Morrow*, 262 N.C. 592, 138 S.E. 2d 245 (1964); *State v. Hamilton*, 264 N.C. 277, 141 S.E. 2d 506 (1965); *State v. Turner*, 268 N.C. 225, 150 S.E. 2d 406 (1966); *State v. Fox*, 277 N.C. 1, 175 S.E. 2d 561 (1970). The cases were properly consolidated for trial and the foregoing assignment is overruled.

Before pleading to the merits defendant Barrett filed a written motion to quash the bill of indictment against him on the ground that he was arrested without probable cause. He asserted in his motion, *on information and belief*, that the victim had failed to identify photographs of him and that the police had refused to place him in a lineup for identification. His counsel, by affidavit in support of the motion to quash, swore he had demanded a lineup for Barrett and, further, that the prosecuting witness stated on oath at the preliminary hearing that she was not certain of her identity of defendant Barrett. The trial judge did not formally rule on the motion, as he should have done, but proceeded with the trial of Barrett upon the true bill of indictment returned by the grand jury. Barrett assigns error. We now examine the validity of his position.

[14-17] A bill of indictment may be quashed for want of jurisdiction, *State v. Sloan*, 238 N.C. 547, 78 S.E. 2d 312 (1953), or for irregularity in the selection of the grand jury, *Miller v. State*, 237 N.C. 29, 74 S.E. 2d 513 (1953), or for irregularity in the selection of the petit jury, *State v. Litteral*, 227 N.C. 527, 43 S.E. 2d 84 (1947), or for defect in the bill of indictment. *State v. Mayo*, 267 N.C. 415, 148 S.E. 2d 257 (1966). Thus a motion to quash is an appropriate method of testing the suffi-

---
**State v. Bass**

---

ciency of the warrant, information, or bill of indictment to charge a criminal offense. It lies only for a defect appearing on the face of the warrant or indictment. *State v. Turner*, 170 N.C. 701, 86 S.E. 1019 (1915). The defect to which the motion is addressed must appear on the face of the record. *State v. Choate*, 228 N.C. 491, 46 S.E. 2d 476 (1948) ; *State v. Davenport*, 227 N.C. 475, 42 S.E. 2d 686 (1947). A motion to quash does not lie unless it appears from an inspection of the warrant or bill of indictment that no crime is charged, *State v. Morgan*, 226 N.C. 414, 38 S.E. 2d 166 (1946), or that the warrant or indictment is otherwise so defective that it will not support a judgment. *State v. Gregory*, 223 N.C. 415, 27 S.E. 2d 140 (1943). "The court, in ruling on the motion, is not permitted to consider extraneous evidence. Therefore, when the defect must be established by evidence *aliunde* the record, the motion must be denied." *State v. Cochran*, 230 N.C. 523, 53 S.E. 2d 663 (1949). *Accord State v. Cooke, Wolfe, et al*, 248 N.C. 485, 103 S.E. 2d 846 (1958) ; *State v. Brewer*, 180 N.C. 716, 104 S.E. 655 (1920). "At least since the decision in *State v. Turner*, 170 N.C. 701, 86 S.E. 1019, in 1915, it has been the settled rule in North Carolina that '[a] motion to quash . . . lies only for a defect on the face of the warrant or indictment.' . . . The rule that a motion to quash cannot rest on matters dehors the record proper has, so far as investigation reveals, been rigidly adhered to in all subsequent North Carolina decisions. [Citations omitted] In the present case the state court simply followed this settled rule of local practice." *Wolfe v. North Carolina*, 364 U.S. 177, 4 L.Ed. 2d 1650, 80 S.Ct. 1482 (1960).

[18] It appears from the record in this case that defendant Barrett, by grand jury indictment proper in form, is charged with committing the capital felony of rape upon Sandra Garner on 6 February 1971. Evidence foreign to the record may not be used to establish a defect in the bill of indictment. The recitals in Barrett's written motion to quash and in his counsel's affidavit were properly ignored by the trial court. His action in that respect was equivalent to denial of the motion and we so regard it. Barrett's assignment of error based thereon is overruled.

[19] Barrett next assigns as error that Sandra Garner was permitted to testify over his objection that she identified him at the preliminary hearing. Barrett asserts that since he had not

been identified by the victim prior to the preliminary hearing, in a lineup or by photograph or otherwise, this evidence should have been excluded. He equates the preliminary hearing to "a lineup in the courtroom without any advice as to the right of counsel and without the presence of counsel," and contends the proceedings were so unnecessarily suggestive and conducive to irreparable mistaken identification as to violate due process guaranteed by the Fourteenth Amendment.

The record does not support the contention that the preliminary hearing was "rigged" for purposes of identifying Barrett. There is no evidence of impermissible suggestiveness by the officers or the court. Sandra Garner testified that she was subpoenaed as a witness to testify at the preliminary hearing and recognized Barrett "as soon as I came into the room. He was seated over on one side of the room against the wall. Nobody prompted me or pointed him out in any way." She said there was no question in her mind that her identification was correct. She further testified that her in-court identification was based on the times she saw defendants the night she was raped. The trial court so found on voir dire and further found, in effect, that the preliminary hearing was not an impermissibly suggestive procedure which likely led the victim into misidentification of her assailants. These findings were based on competent evidence and rendered the victim's in-court identification properly admissible. *State v. Gray, supra.* We hold there has been no denial of due process contemplated by the Fourteenth Amendment.

[20] Furthermore, the record shows that both defendants, and especially Barrett's counsel, cross-examined this young victim at the preliminary hearing and again at the trial with unusual vigor, calling into question her ability to identify Barrett and suggesting many discrepancies and contradictions in her testimony—all of which she denied or attributed to counsel's rapid-fire questions and overreaching tactics. Her positive in-court identification of Barrett suffices to carry the case to the jury. The fact that she failed to identify him from photographs and the fact that there were discrepancies and contradictions in her testimony at the preliminary hearing, if such there were, goes to the weight rather than the competency of the testimony and is thus a matter to be considered by the jury. *Lewis v. United States,* 417 F. 2d 755 (1969), cert. den. 397 U.S. 1058, 25 L.Ed.

2d 676, 90 S.Ct. 1404; *Parker v. United States,* 404 F. 2d 1193 (1968) ; *State v. Hill,* 278 N.C. 365, 180 S.E. 2d 21 (1971). This assignment is overruled.

[21] Barrett's next assignment of error is grounded on the court's comments on three occasions during the trial.

On the first occasion the court directed counsel to restate a question because it was confusing, and counsel refused, saying he was unable to do so. The court replied: "It must not have been important then. If you don't care to restate it, we won't move into it. Now, Mr. Alston, I have told you to ask this witness a question and then wait for an answer. Now, that question is a confusing question for any witness. So you restate your question."

On the second occasion, the State's rebuttal witness Paulette Knox had testified that she was with Barrett's girl friend Brenda Brown on Saturday night, 6 February 1971, during the hours when Brenda Brown and Barrett had testified she was with Barrett. On cross-examination Barrett's counsel asked Paulette Knox: "Which Saturday night in February was it, the first, second, third, or fourth?" The witness answered: "The sixth." Counsel then said: "You say there are six Saturdays in February?" The court interposed: "Just a minute that wasn't what she said at all. You know there are not six Saturdays in February. And you know this witness knows there are not six Saturdays in February." The witness was never afforded an opportunity to say whether she was referring to the sixth *day* or the sixth *Saturday* of February.

On the third occasion the court instructed counsel: "You are not to lecture this witness. I mean what I say. Now, you cross-examine him."

As stated by Mr. Justice Black in *Illinois v. Allen,* 397 U.S. 337, 25 L.Ed. 2d 353, 90 S.Ct. 1057 (1970) : "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of conduct should not and cannot be tolerated."

Standards of conduct imposed on trial judges and trial counsel are discussed by Justice Sharp in *State v. Lynch, supra,* and the reciprocal duties of each are summarized in the follow-

ing language: "In every trial the judge and the defendant's counsel share the twofold responsibility of enforcing a defendant's right to a fair trial and of keeping the trial moving at a reasonable speed. The judge, however, is in charge of proceedings." Had the standards enunciated by Justice Sharp in *Lynch* been courteously observed in the trial of this case, the record would reflect more favorably on all concerned. A failure on the part of counsel to show appropriate respect for the judge almost invariably evokes similar treatment in return.

Considered in context and in the setting in which they occurred, we are inclined to the view that the words of the judge here under attack had no prejudicial effect on the result of the trial. Unless it appears "with ordinary certainty that the rights of the prisoner have been in some way prejudiced by the remarks or conduct of the court, it cannot be treated as error." *State v. Browning*, 78 N.C. 555 (1877). Trial judges must be given sufficient discretion to meet the circumstances of each case. This assignment is overruled.

Barrett's remaining assignments, five in number, relate to the admission of inconsequential evidence, *i.e.*, testimony that the prosecuting witness "was quite nervous," appeared "to be confused," and similar expressions. A careful review of these assignments impels the conclusion that the matters complained of were not prejudicial.

Defendants having failed to show prejudicial error, the verdict and judgment as to each defendant must be upheld.

No error.

Justice LAKE concurring in result.

Had the superior court erred, as the majority opinion states, in admitting evidence of the lineup identification, I would concur in the majority's conclusion that this was harmless error and not ground for granting Bass a new trial. In my opinion, there was no error in the admission of this evidence.

The majority opinion states:

"At all times pertinent to this case, an indigent defendant in a capital case could not waive the right to counsel

either orally or in writing. See 1969 Session Laws, Chapter 1013, § 1, codified as G.S. 7A-457; *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561 (1971)."

I am unable to concur in this statement by the majority which is the foundation for its conclusion that there was error in admitting testimony of identification of Bass by Miss Garner at the lineup. Notwithstanding the amendment to G.S. 7A-457 by Chapter 1243 of the Session Laws of 1971, this statement in the majority's opinion may well have a far reaching effect in other cases in which the offense occurred prior to the amendment.

In no case has this Court ever set aside a conviction in reliance upon G.S. 7A-457. In *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561, cited by the majority in support of its statement herein, a new trial was ordered for the reason that the trial judge, by his method of overruling objections made by the defendant's counsel, may have expressed an opinion as to the credibility of witnesses and thus prejudiced the defendant's cause with the jury. The discussion of G.S. 7A-450 et seq., in the *Lynch* opinion, was not necessary to that decision. The *Lynch* case may not, therefore, be deemed a decision of this Court as to the validity or the effect of those statutes. In *State v. Doss,* 279 N.C. 413, 183 S.E. 2d 671, this Court said that the trial court had erred in admitting a statement made by the defendant at an in-custody interrogation following his written waiver of counsel at such interrogation, the court saying that such waiver was in violation of G.S. 7A-457(a). However, in the *Doss* case, as here, this Court affirmed the sentence on the ground that the error was harmless. In *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227, the State did not offer, in the presence of the jury, evidence that the victim had identified the accused at a lineup. The question was as to the admissibility of the victim's in-court identification of the accused as her assailant. This Court took note of the existence of G.S. 7A-457, but held that the trial court was correct in its conclusion that the in-court identification in that case was competent and said that, in any event, the alleged error was harmless.

Following the proper holding of a voir dire, the trial court found that Bass was specifically advised by the officer of his right to have a lawyer present before going into the lineup, that he indicated to the officer that he was willing to partici-

pate in the lineup without a lawyer present and "would call his lawyer in the morning," and that he "freely and voluntarily, knowingly and understandingly waived his right to counsel before going into the lineup and thereafter did in fact go into said lineup." As the majority opinion states, these findings of fact by the trial judge are conclusive, being supported by competent evidence.

It is my view that G.S. 7A-457 does not require and does not support a holding that there was error in the admission of the testimony of the identification of Bass at the lineup. There are two reasons for this: (1) The statute does not so require; and (2) the statute, itself, is unconstitutional in forbidding the waiver of counsel by an indigent charged with a capital offense.

Assuming the validity of G.S. 7A-457, it does not declare evidence obtained at an in-custody lineup to be inadmissible by reason of the defendant's not having counsel present to represent him at the lineup, he having freely, voluntarily and understandingly waived his right to counsel orally.

We are not here concerned with any violation of the right of the defendant under the Constitution of the United States or under the Constitution of this State to have counsel present to advise and represent him at such lineup. It is established, as the majority observes, that the defendant Bass freely, voluntarily and with full understanding of his constitutional right to counsel, waived that right. Neither *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, nor any other decision of the Supreme Court of the United States, nor of this Court, declares an oral waiver of the constitutional right to counsel invalid. We are here concerned solely with the provisions of the State statute.

*Miranda v. Arizona, supra,* and *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081, do not hold that state courts may not admit evidence obtained in violation of a state statute. The effect of those cases is limited to the admissibility of evidence obtained in violation of the defendant's rights held guaranteed by the Federal Constitution. The effect of a disregard of G.S. 7A-450 et seq., upon the admissibility of evidence so obtained must, therefore, be determined by the law of this State.

It is well established that the common law of North Carolina does not forbid the admission of evidence unlawfully ob-

tained but otherwise competent. *State v. Colson,* 274 N.C. 295, 305, 163 S.E. 2d 376, cert. den., 393 U.S. 1087, 89 S.Ct. 876, 21 L.Ed. 2d 780; *State v. Smith,* 251 N.C. 328, 111 S.E. 2d 188; *State v. Vanhoy,* 230 N.C. 162, 52 S.E. 2d 278; *State v. McGee,* 214 N.C. 184, 198 S.E. 616; Stansbury, North Carolina Evidence, 2d Ed, § 121. See also: Wigmore on Evidence, 3d Ed, §§ 2183-2184a; McCormick on Evidence, § 137; 29 AM. JUR. 2d, Evidence, § 408. A myriad of cases recently decided, relating to the admissibility of evidence obtained by an unlawful search are not in point, first, because these raised a constitutional question under the authority of *Mapp v. Ohio, supra,* and, second, because G.S. 15-27 and G.S. 15-27.1 expressly provide that evidence obtained in a search made under an illegal search warrant, or without a legal search warrant under conditions requiring a search warrant, is incompetent in the trial of any action.

Of course, the Legislature, in an otherwise valid statute, has the authority to change a common law rule as to the competency of evidence. However, there is no provision in G.S. Chapter 7A declaring evidence obtained in disregard of its provisions to be incompetent. In *State v. McGee, supra,* this Court refused to extend, to evidence obtained by a search without any warrant at all, a statute declaring incompetent evidence obtained by a search under an illegally issued warrant. Pursuant to *State v. McGee, supra,* we should not interpolate into G.S. 7A-450, et seq., a change of the common law rule of evidence not expressly declared therein by the Legislature.

If, however, it be thought that G.S. Chapter 7A should be construed as a legislative declaration that evidence is incompetent if obtained at an in-custody lineup in a capital case, prior to which an indigent defendant knowingly, understandingly and voluntarily waived his right to the presence of counsel, and at which he had no counsel present, the evidence here in question would, in my opinion, nevertheless be admissible for the reason that G.S. 7A-457 is unconstitutional insofar as it forbids such defendant to waive his right to counsel and to represent himself.

The defendant's constitutional right to have counsel at an in-custody lineup or interrogation is now clearly established. *Miranda v. Arizona, supra.* It is, however, equally well settled that a defendant has a constitutional right to handle his own

case without interference by, or the assistance of, counsel forced upon him against his wishes.

In *State v. McNeil,* 263 N.C. 260, 139 S.E. 2d 667, Justice Parker, later Chief Justice, said:

> "The United States Constitution does not deny to a defendant the right to defend himself. Nor does the constitutional right to assistance of counsel justify forcing counsel upon a defendant in a criminal action who wants none. *Moore v. Michigan,* 355 U.S. 155, 2 L.Ed. 2d 167; *Carter v. Illinois,* 329 U.S. 173, 91 l.Ed. 172; *United States v. Johnson,* 6 Cir. (June 1964), 333 F. 2d 1004."

In *State v. Bines,* 263 N.C. 48, 138 S.E. 2d 797, Justice Higgins said:

> " 'The constitutional right (to counsel), of course, does not justify forcing counsel upon an accused who wants none.' *Moore v. Michigan* [supra]; *Herman v. Claudy,* 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126."

In *State v. Morgan,* 272 N.C. 97, 157 S.E. 2d 606, this Court said:

> "Having been fully advised by the court that an attorney would be appointed to represent him if he so desired, he [the defendant] had the right to reject the offer of such appointment and to represent himself in the trial and disposition of his case."

In *State v. Williams,* 276 N.C. 703, 174 S.E. 2d 503, this Court affirmed a death sentence imposed for murder in the first degree upon a defendant who was tried without counsel, pursuant to his declaration that he did not want counsel. Our decision was reversed by the Supreme Court of the United States, but upon another ground and without mention of the defendant's having been tried without counsel.

It not infrequently happens that a defendant is dissatisfied with the counsel appointed for him by the court. While he may not insist that the court appoint a different counsel to represent him, the defendant has the right to insist that his case not be handled by an attorney in whom he has no confidence. If he so desires, he has the right, in that situation, to represent himself. In this there is no distinction between a

---

---

capital case and any other case. See *State v. Williams, supra.* If he may represent himself through the intricacies of an actual trial, he surely has the right to look after his own interest at a lineup or at an interrogation free from threats and duress. This right the Legislature may not deny him.

Furthermore, G.S. 7A-457 makes an unconstitutional discrimination between indigent defendants and defendants having enough funds to pay for counsel. The statute forbids waiver of counsel by an indigent but leaves untouched the rights of one who is not an indigent to waive counsel in any case, either in writing or orally. Indigency is obviously a sufficient basis for classification with reference to the right to court appointed, publicly paid counsel if desired, but it is not a reasonable basis for classification as to the right to represent one's self. Poverty is not synonomous with lack of intelligence or even with limited education, and possession of funds does not necessarily mean possession of good judgment or of knowledge of legal procedure.

The purpose of the statutory provision for appointment of counsel, at public expense, for indigent defendants is to put indigent defendants on an equality with affluent defendants in trials upon criminal charges. To deny, or to restrict the right of the indigent to waive counsel, i.e., to represent himself, has no reasonable relation to the objective of equal opportunity to prevail at the trial of the case. Such classification is beyond the legislative power. When a special class of persons (indigents) is singled out by the Legislature for special treatment, there must be a reasonable relation between the classification and the object of the statute. *Quaker City Cab Co. v. Pennsylvania,* 277 U.S. 389, 48 S.Ct. 553, 72 L.Ed. 927; *Power Mfg. Co. v. Saunders,* 274 U.S. 490, 47 S.Ct. 678, 71 L.Ed. 1165; *State v. Glidden Corp.,* 228 N.C. 664, 46 S.E. 2d 860; 16 AM. JUR. 2d, Constitutional Law, § 501.

The defendant, with full knowledge of his constitutional right to have counsel at the lineup and not to enter the lineup without the presence of his counsel, waived that right, thereby electing to represent himself at that stage of the pre-trial proceedings. Having so elected, his constitutional right to represent himself was recognized and granted by the officers. Having so asserted his desire to proceed at that stage without counsel, he may not now be heard to say that, because he was permitted to do so, the evidence so obtained by the State was unlawfully

obtained and is, therefore, inadmissible. Surely, he may not now be heard to say that the lineup, otherwise conducted free from any error, makes inadmissible the positive, in-court identification by the victim of his alleged criminal act.

Consequently, it is my view that there was no error in admitting the testimony that Miss Garner identified the defendant Bass at the lineup and clearly no error in admitting her in-court identification of him, the latter identification being independent in origin and unaffected by the identification at the lineup.